Jerry ANDERSON, Mike Stout, John Dunn,
and Check Mart of Hot Springs, LLC  *v.*
Charles STEWART

05-886                                234 S.W.3d 295

Supreme Court of Arkansas
Opinion delivered April 27, 2006

*Paul Johnson*, for appellants.

*Todd Turner* and *Dan Turner*; and *Orr, Scholtens, Willhite and Averitt*, by: *Jay Scholtens*, for appellees.

TOM GLAZE, Justice. This appeal, certified to us by the court of appeals, poses the issue as to whether the trial court erred in applying the doctrine of "piercing the corporate veil" and holding shareholders in a limited liability company individually liable.[1] We find no error, and affirm.

Appellants Jerry Anderson and Mike Stout are the owners of Check Mart of Hot Springs, LLC; appellant John Dunn is the former owner of Check Mart. Check Mart is a "payday lender," or company that offers cash loans to customers in exchange for personal checks, drawn on the customer's bank account, that are presented to and held by Check Mart. Appellee Charles Stewart filed a class action complaint against Check Mart in November of 2001, alleging that, by charging interest disguised as "fees," Check Mart engaged in conduct amounting to usury, in violation of Ark. Const. art. 19, § 13. Stewart filed a motion seeking class certification on February 4, 2002, and the trial court granted Stewart's motion on January 29, 2003. It defined the class as "any and all persons who have entered into deferred presentment agreements with [Check Mart] . . . within five years of the date that [the] complaint was filed and continuing up through and until judgment may be rendered in this matter."

Also on January 29, 2003, the trial court entered an order granting Stewart's motion for summary judgment on liability, finding that there was no genuine issue of material fact, and that the fees charged by Check Mart "constitute interest and as such would render usurious the contracts between [Check Mart] and the members of this class." The trial court thus determined that the plaintiffs were entitled to judgment on the issue of liability as a matter of law.

---

[1] The court of appeals certified the case to this court, suggesting that we should "decide the extent of the protection that Ark. Code Ann. § 4-32-304 affords investors who chose [to operate as a LLC]." However, the appellants do not raise this broad argument in their brief; accordingly, we do not address the issue suggested by the court of appeals.

On November 14, 2003, Stewart filed his second amended class action complaint, naming as defendants Stout and Anderson, the "sole owners of Check Mart of Hot Springs, LLC," and Dunn, who formerly owned Check Mart and who sold the business to Stout and Anderson. Stewart's complaint alleged that Check Mart, LLC, was the alter ego of Stout, Anderson, and Dunn, who all received financial gain from their operation of the business. Stewart asserted that the trial court had already determined that the plaintiffs were entitled to judgment as a matter of law on the usury claim. In addition, Stewart raised a further cause of action under the Arkansas Deceptive Trade Practices Act (DTPA), Ark. Code Ann. § 4-88-101 *et seq.* (Repl. 2001), alleging that Stout, Anderson, and Dunn were, as controlling and supervising persons, individually liable for the damages caused by Check Mart. Stewart also asked the trial court to pierce the corporate veil, asserting that the defendants operated Check Mart "for the sole purpose of engaging in activities [that] violated the Arkansas usury protections in the Arkansas Constitution," and that Check Mart lacked sufficient assets to satisfy any judgment against it and was inadequately capitalized.

The case was presented at a bench trial on November 9, 2004, and following the trial, the parties agreed to submit briefs on the issue of the liability of the individual defendants. On April 19, 2005, the trial court entered an order finding that the plaintiff class was entitled to damages of $122,027.50, attorneys' fees of $36,878.25, and costs of litigation of $908.42, for a total judgment in favor of the class in the amount of $159,814.17. The court further found that the individual defendants were liable under the Deceptive Trade Practices Act, and apportioned the damages among the individual defendants based on the amount of time they had owned stock in the company. Anderson, Stout, and Dunn filed timely notices of appeal, and now argue that the trial court erred in piercing the corporate veil and holding them each individually liable under § 4-88-101, the DTPA.

In bench trials, the standard of review on appeal is whether the trial court's findings were clearly erroneous or clearly against the preponderance of the evidence. *Weiss v. McFadden*, 356 Ark. 123, 148 S.W.3d 248 (2004); *Carwell Elevator Co., Inc. v. Leathers*, 352 Ark. 381, 101 S.W.3d 211 (2003). This court gives due deference to the superior position of the trial judge to determine the credibility of the witnesses and the weight to be accorded their testimony. *City of Rockport v. City of Malvern*, 356 Ark. 393, 155

S.W.3d 9 (2003); *Pyle v. Sayers*, 344 Ark. 354, 39 S.W.3d 774 (2001). Further, it is within the province of the trier of fact to resolve conflicting testimony. *Myrick v. Myrick*, 339 Ark. 1, 2 S.W.3d 60 (1999).

As noted above, the appellants assert in their brief that the trial court erred in piercing the corporate veil to hold them individually liable. In making this argument, they raise two subpoints: 1) the Arkansas Deceptive Trade Practices Act only provides for proceedings by the Attorney General; and 2) there was insufficient evidence to support the piercing of the corporate veil.

In the first of their two arguments, the appellants contend that Ark. Code Ann. § 4-88-113 of the Deceptive Trade Practices Act, "is applicable to proceedings brought by the Attorney General and does not extend by statute or case law to cases brought outside the scope of the Deceptive Trade Practices Act by the Attorney General." This claim is easily dismissed, as § 4-88-113(f) clearly provides that "[a]ny person who suffers actual damage or injury as a result of an offense or violation as defined in this [Act] has a cause of action to recover actual damages, if appropriate and reasonable attorney's fees." Because the statute provides a cause of action to "any person who suffers actual damages," there is no merit to the appellants' argument that only the Attorney General can bring a DTPA complaint. *See Wallis v. Ford Motor Company*, 362 Ark. 317, 208 S.W.3d 153 (2005) (pointing out that § 4-88-113(f) gives a private cause of action to any person who suffers actual damage or injury, but where the only alleged injury is the diminution in value of the product, a private cause of action is not cognizable under the statute).

The second part of the appellants' argument is that there was insufficient evidence to support the trial court's decision to pierce the corporate veil. It is a nearly universal rule that a corporation and its stockholders are separate and distinct entities, even though a stockholder may own the majority of the stock. *First Commercial Bank v. Walker*, 333 Ark. 100, 969 S.W.2d 146 (1998); *Quinn-Matchet Partners, Inc. v. Parker Corp.*, 85 Ark. App. 143, 147 S.W.3d 703 (2004). In special circumstances, the court will disregard the corporate facade when the corporate form has been illegally abused to the injury of a third party. *EnviroClean, Inc. v. Arkansas Pollution Control & Ecology Comm'n*, 314 Ark. 98, 858 S.W.2d 116 (1993); *Don G. Parker, Inc. v. Point Ferry, Inc.*, 249 Ark. 764, 461 S.W.2d 587 (1971). The conditions under which the corporate entity may be disregarded or looked upon as the alter ego of the principal

stockholder vary according to the circumstances of each case. *Winchel v. Craig*, 55 Ark. App. 373, 934 S.W.2d 946 (1996). The doctrine of piercing the corporate veil is founded in equity and is applied when the facts warrant its application to prevent an injustice. *Humphries v. Bray*, 271 Ark. 962, 611 S.W.2d 791 (Ark. App. 1981). Piercing the fiction of a corporate entity should be applied with great caution. *Banks v. Jones*, 239 Ark. 396, 390 S.W.2d 108 (1965); *Thomsen Family Trust v. Peterson Family Enters.*, 66 Ark. App. 294, 989 S.W.2d 934 (1999). The issue of whether the corporate entity has been fraudulently abused is a question for the trier of fact, and the one seeking to pierce the corporate veil and disregard the corporate entity has the burden of proving that the corporate form was abused to his injury. *See National Bank of Commerce v. HCA Health Servs. of Midwest, Inc.*, 304 Ark. 55, 800 S.W.2d 694 (1990).

Legal treatises have noted that common instances in which the separate corporate identity has been disregarded are when the corporation attempted to 1) evade the payment of income taxes, 2) hinder, delay, and defraud creditors, 3) evade a contract or tort obligation, 4) evade the obligations of a federal or state statute, and 5) perpetrate fraud and injustice generally. *See* H. Murray Claycomb, *Arkansas Corporations* § 3-15 (1991); *see also* 18 C.J.S. *Corporations*, § 9 (1990) (courts will apply substantive law in disregard of corporate license when to interpose it would defeat public convenience, justify wrongs, protect fraud or defend crime, and in situations in which it would otherwise pose an obstacle to the protection or enforcement of private or public rights).

Arkansas cases in which the corporate veil has been pierced have generally involved some fraud or deception. *See EnviroClean, Inc. v. Arkansas Pollution Control & Ecol. Comm'n*, 314 Ark. at 104, 858 S.W.2d at 120 (two companies intended to deceive Pollution Control & Ecology Commission and abused the corporate form by misrepresenting a change in ownership and by attempting to circumvent PC&E's permitting process); *Humphries v. Bray*, 271 Ark. at 966, 611 S.W.2d at 793 (for purposes of determining whether, under workers' compensation statutes, separate companies under a single ownership constituted an employer with five employees, the court noted evidence, including tax records and payroll slips, showing that the owner's three companies were not operated separately); *Winchel v. Craig*, 55 Ark. App. at 381-82, 934 S.W.2d at 950-51.

In *Winchel v. Craig, supra,* the plaintiff-appellee, Craig, was injured by a fertilizer-spreading machine manufactured by appellants Jesse and Verda Winchels' company, Winchel Enterprises. Shortly after Craig filed his complaint, the Winchels resigned as officers of Winchel Enterprises and dissolved the corporation. *Winchel,* 55 Ark. App. at 375, 934 S.W.2d at 947. At trial, a jury found that the affairs of the corporation had been conducted in such a manner that the corporate entity should be disregarded, and the Winchels held personally liable. *Id.* On appeal, the court of appeals affirmed, writing as follows:

> In the instant case, there is evidence that the appellee [Craig] was injured by a spreader manufactured by the corporation Winchel Enterprises; that appellants [Jesse and Verda Winchel] were its sole incorporators, stockholders, and officers; that the corporation had no liability insurance in case someone was hurt by its equipment; that the appellants dissolved Winchel Enterprises and sold or transferred its assets subsequent to appellee filing suit against the corporation; that about a month before the appellants resigned as officers of Winchel Enterprises, they formed a new corporation whose Articles of Incorporation stated that the purpose of the new corporation was to manufacture spreader beds — and this is the same kind of equipment that was manufactured by the first corporation; and that appellants made no provision upon dissolution of the old corporation to provide for payment of any liability it might have to appellee as a result of this suit which was pending at that time.

*Id.* at 381-82, 934 S.W.2d at 950-51.

On the other hand, in cases where the courts refused to pierce the corporate veil, the evidence failed to make a showing of illegality or fraudulent behavior. *See Don G. Parker, Inc. v. Point Ferry, Inc.,* 249 Ark. at 766, 461 S.W.2d at 589 (incorporators took all necessary legal steps to establish a corporation, the shareholders attended corporate meetings, and tax returns were properly filed in the name of the corporation; the only evidence of illegality was the fact that the corporation's ferry was not properly licensed, but the ferry was operated by a lessee, not by the corporation itself); *Banks v. Jones,* 239 Ark. at 399, 390 S.W.2d at 110 (no evidence that there was any interchange of employees, facilities, funds, or management between two companies owned by the same individual; the evidence showed that the two companies were on separate properties and had separate books, and that the corporation filed proper tax returns and carried liability insurance); *Quinn-Matchett Partners*

*v. Parker Corp.*, 85 Ark. App. at 149-50, 147 S.W.3d at 707 (evidence showed that the corporation adhered to corporate formalities by keeping its own financial records and bank accounts, by filing separate tax returns, and by recording the loans made between it and its owner).

In the instant case, appellant Stout testified that he became a stockholder of Check Mart in early 2001 when he and appellant Jerry Anderson bought out appellant Dunn's interest; prior to becoming a stockholder, when Dunn owned the company, Stout had been the registered agent for the business. Dunn had been running the business for over a year at several different locations in Hot Springs when Stout and Anderson bought it. Stout testified that Check Mart closed in December of 2001; he could not recall whether the company continued to collect fees after that time. After Check Mart closed, Stout formed D&L Service Company, which Stout described as a "service company for a loan company out of South Dakota" that serviced loans and collected a fee from the South Dakota loan company. When asked whether a number of Check Mart's customers became customers of D&L Service Company, Stout said that he "would assume so, yes," although he stated that he did not work in the day-to-day operations, so he couldn't testify that he "knew it for a fact."

Stout denied knowing about any of Check Mart's business or customer records, acknowledging that his attorney handled the records and had furnished any and all documents relating to fees paid to Check Mart. Stout further acknowledged that Check Mart did not maintain any customer records or any other documents that would reflect the amount of fees that Check Mart received from its customers. He also agreed that, to his knowledge, D&L did not have any of Check Mart's customer records. Stout stated that the only person who would have knowledge of the company's day-to-day business records would be the manager, Bonnie Berg, who was not present at the trial to testify.

Stout agreed that, in order to have a check cashing business in Arkansas, one has to post a surety bond. In addition, he agreed that a party wishing to obtain a license to operate a check cashing operation must have proof of liquid assets in a certain amount.[2]

---

[2] Ark. Code Ann. § 23-52-107(1) (Supp. 2005) requires an applicant for a check-cashing permit to "have a minimum of cash or other liquid assets of at least … ($20,000) for the operation of each location at which the applicant will engage in the check-cashing business

Stout sought a letter of credit from First State Bank to satisfy the statutory cash-on-hand requirements, but cancelled the letter of credit on February 5, 2002, some three months after Stewart's lawsuit was filed. Stewart introduced the surety bond, naming Dunn as principal, that was posted by Check Mart when the company was started in March of 2000, and Stout agreed that the bond was the only bond ever posted for Check Mart. However, he did not recognize any other related documents, and he could not state positively whether the bond was ever canceled. Stout could also not be "absolutely positive" about whether Check Mart had surrendered its check cashing license to the State, although Check Mart's bond was canceled on February 6, 2002.

Stout testified that, other than Bonnie Berg, Check Mart had no other full-time employees, and that no one else besides himself, Dunn, or Anderson had ever been owners of the company. He also stated that he and his wife operated Check Mart of Conway, Inc., another "servicer" for the South Dakota loan company. He said that the way the Conway Check Mart operated was that a customer would come in and make a loan application, which was transmitted to South Dakota; if the loan was approved, a check was printed from the South Dakota office, and the customer could cash the check in the Conway office or take it to the customer's bank. The customer would leave a check at the Conway office as collateral for that loan. If the customer did not come back when the loan was due, Check Mart of Conway would deposit the customer's check "as a servicer for the loan company."

Stout said that he believed the State revoked the license for Check Mart of Hot Springs, and he agreed that after the instant lawsuit was filed, Check Mart had no assets. However, tax records introduced at trial showed that Stout reported $33,397 in gross receipts from Check Mart on his personal tax return in 2001.

Stewart also introduced copies of "dun letters" sent by Check Mart to customers who failed to make payments on their transactions with Check Mart and whose checks were dishonored by their banks. Stout "assumed" that Check Mart would maintain copies of any such letters sent to customers, but did not know for a fact. Stout denied having any knowledge of the amounts of fees paid to Check Mart by customers, and denied knowing whether

and shall be required to post with the State Board of Collection Agencies a fifty-thousand-dollar bond payable to the State of Arkansas[.]"

Check Mart ever sued any of its customers, despite the introduction into evidence of a small claims complaint filed in the name of Check Mart and signed by Bonnie Berg, the store's manager. Further, Stout denied knowing anything about whether Check Mart maintained copies of checks written to the company. Stout professed that it was his intent for Check Mart to comply with the Arkansas Check Casher's Act, but did not know whether, or for how long, the Act required him to retain any records.

When asked whether Check Mart ever had an accountant, Stout stated that the company did not have an accountant, although he personally had one. Stout was unsure whether Berg kept the books for Check Mart "or if the accountant posted [them]," and did not know who prepared the company's profit-and-loss statement. That profit-and-loss statement for the period from January through November of 2001 reflected a loss of $7,078; Stout could not explain why the entire amount of that same loss was reported on his personal tax returns for 2001.

Stewart also called Sharon Harper to testify at the trial of this matter. Harper testified that she had begun doing business with Check Mart in 2000 and continued doing business with Check Mart until 2002. After 2002, Harper said that she did business with D&L Service Company, and the "same lady" who had worked for Check Mart was working for D&L.

On these facts, the trial court's decision to pierce the corporate veil and hold the individual defendants liable was not clearly erroneous. The evidence demonstrated that Check Mart and its owners failed to properly maintain business records, thereby failing to comply with the Check Casher's Act.[3] In addition, Stout withdrew Check Mart's letters of credit and canceled the bond Check Mart had posted shortly after this lawsuit was filed, an act which Stewart contends was designed to ensure that Check Mart would not have the appropriate assets to satisfy any judgment that might be entered against the company. Further, Sharon Harper's

---

[3] Ark. Code Ann. § 23-52-112(a) (Repl. 2000) requires check cashers to "keep and use in its business any books, accounts, and records that the State Board of Collection Agencies may require to carry into effect the provisions of this chapter and the administrative regulations issued hereunder"; § 23-52-112(b) requires check cashers to "preserve all relevant records for a period of at least two (2) years after making the last entry on any transaction."

testimony revealed that, even after Check Mart closed, the same individuals were operating the same kind of business in the form of D&L Service Company.

These facts are strikingly similar to those in *Winchel v. Craig, supra,* where the court of appeals noted that after the defendant company was dissolved, a new one was formed with the identical purpose, and that no provision had been made upon dissolution of the old company for the payment of any liabilities the old company might have incurred. Given the evidence before it, we hold that the trial court did not err in piercing the corporate veil and holding the individual defendants personally liable.