SEARCY FARM SUPPLY, LLC; Billy Tripp;
and Billy Tripp Farms  *v.*  MERCHANTS & PLANTERS BANK;
Lee Vaughn Clark, Sr.; Wilma Clark; United States of America Farm
Services Agency; Connie Waters Boyster; Helena Chemical
Company; and First Community Bank

06-892                                    256 S.W.3d 496

Supreme Court of Arkansas
Opinion delivered May 3, 2007

*Larry Killough, Jr.*, for appellant.

*Boyce and Boyce*, by: *Edward Boyce*, for appellee Merchants & Planters Bank.

JIM GUNTER, Justice. This appeal arises from an order of the Jackson County Circuit Court, ruling that several security interests of Appellee Merchants and Planters Bank (Bank) in crops and crop proceeds had priority over a purchase money security interest ("PMSI") of Appellants Searcy Farm Supply, LLC (Searcy), Billy Tripp (Tripp), and Billy Tripp Farms. Appellants also appeal the circuit court's findings on damages, asserting that the circuit court resorted to speculation and conjecture in arriving at the total bushels actually produced from the acreage subject to the Bank's lien. We affirm the circuit court's rulings.

## I. Facts

In 2001, Appellees Lee Vaughn Clark, Sr. and Wilma Clark went to the Bank to find financing for his 2001 farming operations. The Clarks entered into two separate, collateralized transactions.[1] On July 11, 2001, Mr. Clark entered into his first transaction and delivered to the Bank a promissory note for $120,000, payable on March 31, 2002, with an interest rate of eight-and-one-half

---

[1] We note that this appeal involves Clark's transactions with the Bank involving his crop as collateral. A third transaction, in which Clark gave the Bank a mortgage on real estate, was conducted on February 12, 2001, and is not the subject of this appeal. The circuit court awarded judgment for the Bank in the amount of $13,134.41 plus interest on the February 12, 2001 note. Further, we note that separate Appellee United States of America Farm Service Agency asserted a prior lien on mortgages. The Bank abandoned its interest on this particular claim because of future foreclosure proceedings in federal court. Similarly, Appellee Helena Chemical Company (Helena) claimed an interest in the land by virtue of a judgment filed on July 1, 2002. Helena was present at the bench trial but did not pursue its claim, thereby effectively abandoning any claim to the collateral at issue here. *See D'Arbonne Construction Co. v. Foster*, 348 Ark. 375, 72 S.W.3d 862 (2002). Additionally, Appellee Zenith Seed Company made an entry of appearance, stating that it had dissolved and held a judgment lien junior to the Bank's lien.

percent. In order to secure the promissory note, the Clarks gave the Bank a mortgage on real estate and a security interest in crops, government payments, and specified equipment. On July 12, 2001, the Bank perfected its security interest in the property by filing the financing statements with the Jackson County Circuit Clerk. On July 16, 2001, the Bank also filed the financing statement with the Secretary of State. The Clarks failed to pay the promissory note, and the note remained in default.

The Clarks entered into a second transaction. On September 4, 2001, the Clarks for valuable consideration, made, executed, and delivered to the Bank their promissory note in the sum of $9,700, due on March 31, 2002, with an interest rate of eight percent. The Clarks gave the Bank a mortgage on real estate, as well as a security interest in crops, government payments, and specified equipment. On September 6, 2001, the Bank perfected its security interest in the property by filing the financing statements with the Jackson County Circuit Clerk, who assigned the filing number, 2001-820. The Bank filed the financing statement with the Secretary of State on September 10, 2001. The Clarks failed to pay the promissory note at maturity, and the note remained in default.

Specifically, in order to secure the promissory notes dated July 11, 2001, and September 4, 2001, the Bank took a security interest in crops to be grown on 931 acres of crop land of the Cornelius Waters Estate Lands ("Waters farm"). The Bank perfected these security interests. Clark used the proceeds from the Bank's promissory notes, dated July 11, 2001, and September 4, 2001, to finance his farming operations in 2001. However, farming was not good for Clark in 2001. He did not pay the Bank at the time of the 2001 harvest, but carried his debt over. The Bank did not finance Clark in 2002, but continued to hold a perfected security interest in crops to be grown on the 931 acres of the Waters farm.

In 2002, Clark farmed 3,300 acres. 1,941.6 acres were leased from Appellee Connie Waters Boyster, individually and as trustee of the Phillip Sue Waters Revocable Trust (collectively "Boyster"). The 1,941.6 acres included the 931 acres of the Waters farm in which the Bank continued to hold a crop lien. The rental agreement between Boyster and Clark provided that Clark agreed to pay Boyster, and the Boyster trust received government payments totaling $54,383, which were applied to Clark's rent obligation. Clark never paid the balance of the rent.

In 2002, a large portion of the Clark farming operation on the Waters farm included a corn crop ("corn project"). Clark purchased seed, chemicals, fertilizer, and farming materials for the corn project from Searcy and Tripp. Because Clark was carried on an open ticket, Searcy, in an effort to protect its account, took a security interest in Clark's 2002 crops. Clark and Searcy entered into a security agreement "for the purpose of arranging the advancement of seed and other farming supplies . . . for use by [Clark] in farming operations," and Clark gave Searcy a security interest pursuant to the Uniform Commercial Code "in all crops and other plant products grown and to be grown on [Clark's] property as well as all proceeds and products from said crops." Clark executed the financing statements, which Searcy filed with the Jackson County Circuit Clerk on March 6, 2002, March 12, 2002, May 17, 2002, and May 24, 2002. The UCC financing statement, filed on May 17, 2002, stated that it covered "the following collateral: All growing crops on the lands described."

In 2002, Clark again did not do well with his farming operations. Larry Burchfield, a consultant for Searcy, inspected the corn project and found the soil to be sandy and the corn to be in poor condition. Tripp confirmed Burchfield's findings. Clark harvested the corn project from the Waters farm. Searcy and Tripp hauled the corn, dried it, and sold it at a price of $2.76 per bushel. At the time of trial, Clark's balance due to Searcy was approximately $112,000 for his 2002 crop transactions.

On August 22, 2002, the Bank filed a complaint against the Clarks, First Community Bank, Searcy, and Billy Tripp d/b/a Billy Tripp Farms. The Bank requested that a restraining order issue and that a receiver be appointed to harvest the Clarks' crop. Further, the Bank sought a judgment against the Clarks for the principal indebtedness and accrued interest on the three promissory notes, attorneys' fees, court costs, and other fees. The Bank filed a first-amended complaint on September 18, 2002. An amendment to the first-amended complaint was filed by the Bank on October 16, 2002. Answers from First Community Bank, Searcy and Tripp, and the United States of America Farm Services Agency were subsequently filed.

On September 24, 2002, the circuit court ordered Searcy and Tripp to provide to the other parties a copy of the harvest accounting information from the Waters farm, to make arrangements for a third-party inspector on behalf of the Bank to view and measure the crops, to sell the crops harvested from the Waters farm, and to provide the sale information to the other parties.

However, on April 21, 2003, the circuit court entered an order finding that Searcy and Tripp were in contempt of court for violating the terms of the September 24, 2002 order. The circuit court found that Searcy and Tripp sold the crops that were the subject of the order and had in their possession the copies of the settlement sheets detailing the sale of the crops and the proceeds received from that sale. The court directed Searcy and Tripp to pay the clerk. A subsequent order entered on May 8, 2003, found Searcy and Tripp in contempt for refusing to abide by the terms of the September 24, 2002 order for failing to pay into the court's registry and for failing to provide the settlement sheets to substantiate the proceeds of the corn sale.

A bench trial was held on November 12, 2003. On June 19, 2006, the circuit court entered an order in favor of the Bank, finding that the Clarks owed $120,000 plus interest on the July 11, 2001 note, and $9,700 plus interest on the September 4, 2001 note. Further, the circuit court made the following rulings in its order:

> 26. With regard to time of perfection, Merchants & Planters Bank has the prior lien in said crops. Based upon [Ark. Code Ann.] § 4-9-322(a)(1) Merchants & Planters Bank is entitled to priority as the first lienholder to file and perfect its security interest. The priority of Merchants & Planters is limited to crops grown on the 931 acres identified.

> 27. Billy Tripp and Searcy Farm Supply, LLC assert a priority over Merchants & Planters Bank based upon their having a purchase money security interest under [Ark. Code Ann.] § 4-9-324. Billy Tripp and Searcy Farm Supply sold seed, chemicals, fertilizer, and advice to Clark. Clark produced a crop with those products. The provisions of [Ark. Code Ann.] § 4-9-324 do not operate to give Searcy Farm Supply and Billy Tripp a lien in Clark's crops prior to that of Merchants & Planters Bank.

> 28. The draftsmen of Revised Article 9 to the Uniform Commercial Code wrote 9-103A and 9-324A in order to provide for a production money security interest such as Billy Tripp and Searcy Farm Supply assert. Those sections were not adopted in Arkansas.

The circuit court found that the Bank had a prior lien in Clark's crops. The circuit court also ruled that Appellee First Community Bank had a prior lien on Clark's farm equipment, which is not the subject of this

appeal. Additionally, the circuit court found that Connie Waters Boyster was entitled to judgment for Clark's rent obligation. A notice of appeal was timely filed on July 5, 2006. From the June 19, 2006 order, Appellants bring their appeal.

## II. Priority of the liens

For their first point on appeal, Appellants argue that the circuit court erred in ruling that the Bank was entitled to a priority over their security interests in the corn project. Specifically, Appellants contend that the circuit court erroneously interpreted Ark. Code Ann. § 4-9-322 (Repl. 2001) because, they maintain, its PMSI followed the crop, including the proceeds from the sale of the crop, and took priority over the Bank's lien. Relying upon Ark. Code Ann. § 4-9-324 (Repl. 2001), Appellants assert a superpriority status because section 4-9-324 "is broad enough to encompass a 'seedmoney lender' as a purchase money security interest holder." Further, Appellants claim "that Arkansas law has long afforded a special priority to those who assist farmers with financing the planting, growing, and harvesting of their crops."

The Bank responds, arguing that the circuit court properly ruled that the Bank's lien had priority under Ark. Code Ann. § 4-9-322 because of its first-in-time, first-in-right status. Appellees specifically contend that certain revised provisions of Article 9 of the Uniform Commercial Code ("UCC") apply to the present case; however, Appellees assert that those revised provisions have not been adopted in Arkansas.

This appeal presents an issue of statutory construction. The basic rule of statutory construction is to give effect to the intent of the legislature by giving words their usual and ordinary meaning. *Arkansas Soil & Water Conservation Comm'n v. City of Bentonville*, 351 Ark. 289, 92 S.W.3d 47 (2002). Where the statutes are unambiguous, we construe them by looking to all laws on the subject, viewing them as a single system, and giving effect to the general purpose of the system. *Id.* We take pains to harmonize statutes that are seemingly in conflict. *See, e.g., Barclay v. First Paris Holding Co.*, 344 Ark. 711, 42 S.W.3d 496 (2001). Further, it is blackletter law for statutory construction to give effect to the specific statute over the general. *Id.*

The primary issue in this appeal involves the priority of liens in crops. The rules of priority are governed by Article 9 of the Uniform Commercial Code, which is codified at Ark. Code Ann.

§§ 4-9-101 – 4-9-709 (Repl. 2001 and Supp. 2005). In Arkansas, the general rule of priority, found at Ark. Code Ann. § 4-9-322, provides in pertinent part:

> (a) Except as otherwise provided in this section, priority among conflicting security interests and agricultural liens in the same collateral is determined according to the following rules:

> (1) Conflicting perfected security interests and agricultural liens *rank according to priority in time of filing or perfection.* Priority dates from the earlier of the time a filing covering the collateral is first made or the security interest or agricultural lien is first perfected, if there is no period thereafter when there is neither filing nor perfection.

> (2) A perfected security interest or agricultural lien has priority over a conflicting unperfected security interest or agricultural lien.

> (3) The first security interest or agricultural lien to attach or become effective has priority if conflicting security interests and agricultural liens are unperfected.

*Id.* (emphasis added). Our well-established rule is that the priority of liens is generally determined by the maxim, first-in-time, first-in-right. *Dempsey v. Merchants Nat'l Bank,* 292 Ark. 207, 210, 729 S.W.2d 150, 151 (1987).

Appellants, however, ask us to abandon this longstanding rule of priority in order to carve out an exception, which, they contend, is found in Ark. Code Ann. § 4-9-324(a). Specifically, appellants contend that their PMSI is in the "identifiable pro-ceeds," *id.,* of the collateral sold to Clark. Section 4-9-324 provides in pertinent part:

> (a) Except as otherwise provided in subsection (g), a perfected purchase-money security interest in goods other than inventory or livestock has priority over a conflicting security interest in the same goods, and, except as otherwise provided in § 4-9-327, a perfected security interest in its identifiable proceeds also has priority, if the purchase-money security interest is perfected when the debtor receives possession of the collateral or within twenty (20) days thereafter.

> (b) Subject to subsection (c) and except as otherwise provided in subsection (g), a perfected purchase-money security interest in

inventory has priority over a conflicting security interest in the same inventory, has priority over a conflicting security interest in chattel paper or an instrument constituting proceeds of the inventory and in proceeds of the chattel paper, if so provided in § 4-9-330, and, except as otherwise provided in § 4-9-327, also has priority in identifiable cash proceeds of the inventory to the extent the identifiable cash proceeds are received on or before the delivery of the inventory to a buyer, if:

(1) the purchase-money security interest is perfected when the debtor receives possession of the inventory;

(2) the purchase-money secured party sends an authenticated notification to the holder of the conflicting security interest;

(3) the holder of the conflicting security interest receives the notification within five (5) years before the debtor receives possession of the inventory; and

(4) the notification states that the person sending the notification has or expects to acquire a purchase-money security interest in inventory of the debtor and describes the inventory.

*Id.*; *see also Herringer v. Mercantile Bank*, 315 Ark. 218, 866 S.W.2d 390 (1993) (decision under prior law) (holding that the purchase money security interest had priority over all conflicting security interests, including the landlord's lien); *Neidermeier v. Central Prod. Credit Ass'n*, 300 Ark. 116, 777 S.W.2d 210 (1989) (decision under prior law) (holding that the bank's extension of the farmer's crop loan did not constitute "new value" giving the association's security interest in the farmer's crops priority over the bank's security interest).

With this precedent in mind, we turn to the two statutes at issue. Here, Arkansas Code Annotated § 4-9-324 establishes the priority for PMSIs and provides that the interest extends to the goods sold or its "identifiable proceeds." The collateral for Searcy's PMSI was seed, chemicals, and fertilizer rather than Clark's crop. In other words, the collateral sold to Clark by Searcy was "seed and other farming supplies," as noted by the security agreement, for the express purpose of Clark's use in his farming operations. " 'Collateral' means the property subject to a security interest or agricultural lien." Ark. Code Ann. § 4-9-102(a)(12). The term includes "proceeds to which a security interest at-

taches." Ark. Code Ann. § 4-9-102(a)(12)(A). While Appellants argue that Clark's crops are the "identifiable proceeds" of that collateral under section 4-9-324, we do not agree. Arkansas Code Annotated § 4-9-102(a)(64) defines "proceeds" as follows:

> (A) whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral;
>
> (B) whatever is collected on, or distributed on account of, collateral;
>
> (C) rights arising out of collateral;
>
> (D) to the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, the collateral; or
>
> (E) to the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to, the collateral.

*Id.* Appellants fail to cite any case law or statutory authority that defines crops as the identifiable proceeds of seeds, and without such authority, we decline to do so. *See Farmers Cooperative Elevator Co. v. Union State Bank*, 409 N.W.2d 178, 180 (Iowa 1987) (holding that hogs are not the proceeds of the feed they consume). Therefore, based upon our rules of statutory construction, we see no express seedmoney-lender provision in section 4-9-324, nor do we interpret section 4-9-324 to give a superpriority to agricultural-supplier liens. *See e.g.*, Jason Finch, *The Making of Article 9 Section 9-312(2) into Model Provision Section 9-324A: The Production Money Security Interest: Finally a Sensible "Superpriority" for Crop Finance*, 5 Drake J. Agric. L. 381, 385 (2000).

We adhere to the well-established first-to-file rule found in Ark. Code Ann. § 4-9-322, which provides that, when there are conflicting security interests, priority is given "to priority in time of filing or perfection." *Id.* Here, the Bank had a perfected security interest in Clark's crops from the time that the financing statements were filed in July and September of 2001; Searcy's PMSI was not filed until March and May of 2002. Under section 4-9-322, the Bank had a first-in-time lien on Clark's crops. Under

the revised provisions of UCC 9-103A, and 9-324A, Appellants would have had a PMSI that was superior to the Bank's perfected security interest; however, these UCC sections have not been adopted by our legislature. *See* U.C.C. §§ 9-103A and 9-324A (2006). While we recognize that this result appears harsh for the agricultural suppliers of our state, the resolution of this policy issue is a matter better left to our legislature. Therefore, based upon the foregoing reasons, we hold that the circuit court properly ruled that the Bank's interest was "first, prior, and paramount to the security interest" of Appellants.

### III. Damages

For their second point on appeal, Appellants argue that the circuit court erred in calculating the damages sustained by the Bank. Specifically, Appellants contend that there was no evidence to support the circuit court's methodology or its ultimate conclusion on the acreage planted and average yield. In response, the Bank argues that the circuit court's award to the Bank is supported by substantial evidence. The Bank asserts that the common-law doctrine of confusion of goods should also be considered.

Rule 50 of the Arkansas Rules of Civil Procedure states in pertinent part:

> In nonjury cases a party may challenge the sufficiency of the evidence at the conclusion of the opponent's evidence by moving either orally or in writing to dismiss the opposing party's claim for relief. The motion may also be made at the close of all of the evidence and in every instance the motion shall state the specific grounds therefor.

Ark. R. Civ. P. 50(a) (2006). Here, Searcy Farm failed to make a motion to dismiss during the civil bench trial. However, we have held that, in a non-jury trial, a party who does not challenge the sufficiency of the evidence does not waive the right to do so on appeal. *See, e.g.*, *$15,956 in U.S. Currency v. State*, 366 Ark. 70, 233 S.W.3d 598 (2006); Ark. R. Civ. P. 50(e).

On appeal, Searcy makes a sufficiency-of-the-evidence argument, but the standard of review in a bench trial is not whether there is substantial evidence to support the findings of the circuit court, but whether the circuit court's findings were clearly erroneous or clearly against the preponderance of the evidence. *Parker*

*v. BancorpSouth Bank,* 369 Ark. 300, 253 S.W.3d 918 (2007). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a firm conviction that a mistake has been committed. *See id.* Disputed facts and determinations of credibility are within the province of the factfinder. *See id.*

In the present case, the circuit court made the following findings: (1) Clark's corn project was comprised of 931 acres of the Waters farm, with 3,300 acres in total; (2) in 2002, Searcy and Tripp assumed control of Clark's corn project, including the Waters farm; (3) Searcy and Tripp harvested the corn on the 3,300-acre project, stored it, and later sold it; (4) 244,795.29 bushels of corn were harvested from 3,300 acres; (5) corn was sold for a price of $2.76 per bushel; (6) the average yield per acre for the entire 3,300 acres was 74.17 bushels per acre; (7) the testimony was credible that the Waters farm had a yield below the 74.17 bushels per acre; (8) Tripp's testimony that the Waters farm produced only 26.7 bushels per acre was not credible; (9) the circuit court found that the Waters farm produced 49.45 bushels per acre; and (10) corn was grown on the entire 931 acres of the Waters farm. Based upon these findings, the circuit court calculated in the following manner: 931 acres (corn project on Waters farm) x 49.45 bushels per acre x $2.76 per bushel (average price of corn per bushel) = $127,064.75.

Appellants argue that "the trial court pulled a number out of thin air for his conclusion on the per acre yield of corn," considering that wheat was grown on the same acreage. Specifically, Appellants contend that there was "no evidence at all to support the trial court's conclusion that the Waters farm produced 49.45 bushels per acre" or that there were 931 acres of corn grown and harvested. In response, the Bank claims that "[t]he court was satisfied that the Waters's ground was not the top producing ground in the corn project, but did not believe that the yields were as pitiful as Tripp portrayed them."

Here, the circuit court arrived at the figure of 49.45 bushels per acre, which was a number between the testimony that there was an average yield of 74.17 bushels per acre and Tripp's testimony of 26.70 bushels per acre. It appears that the court based its figures on the following calculation: 2/3 of the overall yield or 2/3 x 74.17=49.45. Nevertheless, these figures primarily are based upon the testimony which the circuit court found credible. We give due deference to the superior position of the trial judge to

determine the credibility of witnesses and the weight to be accorded to their testimony. *C.A.R. Transp. Brokerage Co., Inc. v. Seay*, 369 Ark. 354, 255 S.W.3d 445 (2007). Additionally, we are unable to say that the damages are excessive. The circuit court's ruling was well within the range of the testimony presented. *See Arkansas State Highway Comm'n v. Rye*, 255 Ark. 223, 499 S.W.2d 624 (1973). For these reasons, we hold that the circuit court was not clearly erroneous in that it properly based its decision on evidence that it found to be credible.

Further, we note that the Bank raised another argument regarding Searcy's failure to timely file its financing statements. However, in oral argument, the Bank conceded that, after reviewing the record, this argument is "a non-issue." For this reason, we decline to address the merits of the Bank's arguments on this point.

Affirmed.