Cite as 2020 Ark. 246

# SUPREME COURT OF ARKANSAS

No. CV-18-158

|  |  |
|---|---|
| | Opinion Delivered: June 11, 2020 |
| AGRIFUND, LLC; AND HAMPTON PUGH COMPANY, LLC<br><br>APPELLANTS | APPEAL FROM THE DESHA COUNTY CIRCUIT COURT [NO. 21ACV-15-125] |
| V. | |
| REGIONS BANK; HILL SEED & ELEVATOR, INC.; OPTIMUM AGRICULTURE, LLC; AND HUBBARD BRAKE, LLC<br><br>APPELLEES | HONORABLE ROBERT BYNUM GIBSON, JR., JUDGE<br><br><u>AFFIRMED</u>. |

**SHAWN A. WOMACK, Associate Justice**

This intercreditor dispute is about lien priority to crop proceeds. Despite the complicated history of this case, this appeal boils down to three creditors. In a nutshell, AgriFund, LLC, argued that its lien is superior to those held by Regions Bank and Optimum Agriculture, LLC.[1] The circuit court disagreed. It concluded that Regions had priority to the proceeds. It also held that Optimum was entitled to a statutory landlord lien. We affirm.

---

[1]AgriFund was substituted as successor to Ag Services Management, LLC ("ARM"), and is represented by the same counsel as ARM. We follow the circuit court's lead in referring to this party as ARM.

I.

A.

Scott Day is a row crop farmer in Southeast Arkansas. In 2014, he operated under three partnerships collectively referred to as "the Old Entities."[2] The following year, Day farmed under three new partnerships, called "the New Entities."[3] On paper, Day farmed as one partner in one partnership each year, but he made the financial decisions, signed on behalf of other partners, and otherwise controlled the entities. The partnerships were, in practice, Day-run businesses.

The 2014 crop season was farmed under the Old Entities and financed by Regions. To secure the debt, the Old Entities pledged "[a]ll crops; whether any of the foregoing is acquired now or later; whether any of the foregoing is now existing or hereafter raised and grown[.]" Regions perfected its security interest and in turn held a priority lien against the Old Entities' crops. The Old Entities failed to pay back $1.87 million.

At the turn of the year, Day created the New Entities. He initially planned to farm the 2015 season under the Old Entities. But the New Entities were there if needed. Day applied for crop insurance and financing with the Old Entities. Given the substantial carryover from 2014, Regions declined to finance the 2015 season.

---

[2]The Old Entities include: Scott Day Farms Partnership; Beau and Shea Farms Partnership; and Matt and Holly Farms Partnership.

[3]The New Entities include: Crawdad Hole Farms Partnership, Haley Farms Partnership, and Gum Ridge Farms Partnership.

Day then turned to ARM. Robby Miller was the ARM loan officer who handled Day's accounts. Miller quickly found a "pile of UCC's from Regions on [Day] and his different entities" and other liens against the Old Entities. Miller accordingly asked if Regions would sign a subordination agreement. ARM refused to finance the Old Entities absent subordination. Miller told Regions that Day repeatedly concealed information about other creditors. Day told creditors not to inform Miller about the debts he owed. He also changed his loan application eight times. Miller nevertheless continued to pursue subordination in order to finance the crop loan.

In the meantime, Day purchased seed and other inputs on credit from Hill Seed and Elevator, Inc. ("Hill") and Hampton Pugh, LLC ("Pugh"). Day asked Clarke Pugh, owner of Hampton Pugh, to lend him $400,000 on the ruse that the money would help with planting while he waited for crop loans. Given their friendship, Clarke Pugh agreed to loan the money. Rather than put crops in the ground, Day paid $375,000 to Regions to encourage subordination.

On June 10, Miller warned Regions that Day might certify the crop under his brother's entities if he did not receive a loan. Two days later, the plan changed. Miller told Regions that "if the [Old Entities] cannot go forward, [Day] will pursue different entities that can." He urged Regions to quickly agree to subordination to protect its interest in the 2015 crop. Regions subsequently refused to sign the subordination agreements.

It appears that Miller came up with the idea to use the New Entities. While the subordination discussions were ongoing, Day obtained tax identification numbers and

partners for the New Entities. After Regions refused to subordinate, Day filed ARM loan applications for the New Entities. The next day, ARM loaned the New Entities roughly $2.5 million. ARM perfected its lien against the New Entities' crops and Day, individually.

At the close of the 2015 season, it became evident that Day's partnerships would again default on the loans. The 2015 crop proceeds totaled $2.9 million. But the asserted liens against the proceeds surpassed $6 million. Regions, ARM, Hill, and Pugh each claimed security interests against the proceeds. Optimum and Hubbard Brake, LLC, also asserted landlord liens against the New Entities for the 2015 lease of Hubbard Farm.

B.

This litigation was commenced by Hill and Pugh, and later consolidated with a separate action filed by ARM. Multiple parties asserted a variety of claims, crossclaims, and counterclaims. The circuit court bifurcated the priority claims to be resolved at a bench trial. Any remaining claims for damages would be reserved for a later jury trial.

Most claims were settled immediately before trial. The first settlement dismissed the claims between ARM, Hill, and Pugh. They agreed to divide any money received in the lawsuit. The second settlement dismissed Hubbard Brake's claims against Optimum for breach of contract. Additionally, the court ruled that Optimum was entitled to a landlord's lien against the proceeds. Only one dispute remained: priority between Regions and ARM.

Following a two-day bench trial, the court concluded that Regions was entitled to a first lien and judgment against the proceeds. This conclusion was buttressed by the court's factual findings regarding Day and Miller. Notably, the court expressly rejected the

credibility of Day's testimony. It found that Day was the "sole ringleader/shot caller" for the New and Old Entities. The entities had "no relevance" and were "merely alter egos of Scott Day used to qualify for government payments and to move credit around." The substitution of the New Entities was a sham. In short, the court found Day's conduct to be inequitable and unfair.

The court found that ARM had knowledge of Day's dishonesty. It also found that ARM had actual or constructive knowledge about Regions' lien on the Old Entities' crop. It knew the Old Entities existed and operated under those entities until it became apparent that Regions would not provide subordination. The court concluded this was the "wrong and inequitable way to get around the issue."

In closing, the court held it is "the legislative intent under the Uniform Commercial Code to provide security to a lender like Regions Bank when they are unpaid and when there has not been a change in the operator." It also found that this case "came down to Scott Day or Scott Day Farms Partnership all the way through." Accordingly, it held that Regions was entitled to a priority lien against the proceeds. The court memorialized Optimum's landlord lien and the settlements between the parties. This appeal followed.

The Arkansas Court of Appeals initially remanded this case to settle and supplement the record. *See AgriFund, LLC v. Regions Bank*, 2019 Ark. App. 414. We accepted certification from the court of appeals. *See* Ark. Sup. Ct. R. 1-2(d) (2019).

II.

5

ARM asks us to hold that its lien is first in priority to the 2015 crop proceeds, placing it ahead of both Regions and Optimum. Two distinct types of liens are at play. ARM and Regions hold security interests governed by the Uniform Commercial Code. *See* Ark. Code Ann. § 4-9-109 (Supp. 2009). Optimum, on the other hand, holds an agricultural landlord's lien. This statutory lien is not subject to the Uniform Commercial Code. *See* Ark. Code Ann. § 18-41-101 (Repl. 2003). We separately address ARM's challenges to each lien in turn.

Following a bench trial, our standard of review asks whether the circuit court's findings were clearly erroneous or clearly against the preponderance of the evidence. *See Hartness v. Nuckles*, 2015 Ark. 444, at 10, 475 S.W.3d 558, 565. We view the evidence and all reasonable inferences arising therefrom in the light most favorable to the appellee. *Id.* Disputed facts and determinations of witness credibility are within the province of the trier of fact. *Id.* For questions of law, our review is de novo. *See Gulfco Louisiana, Inc. v. Brantley*, 2013 Ark. 367, at 10–11, 430 S.W.3d 7, 13.

A.

We first address the priority dispute between ARM and Regions. Relying on the circuit court's findings that the New and Old Entities were shams and served as Day's alter egos, ARM contends it has priority to the proceeds as the sole lienholder against Day

6

individually. Alternatively, ARM argues it would be inequitable to grant Regions a priority interest in crops it did not help finance.[4]

Priority among competing lienholders is governed by Article 9 of the Uniform Commercial Code. *See* Ark. Code Ann. §§ 4-9-101 to -809 (Repl. 2001). Priority is generally determined by the principle "first in time, first in right." *See* Ark. Code Ann. § 4-9-322(a) (Repl. 2001); *see also Searcy Farm Supply, LLC v. Merchants & Planters Bank*, 369 Ark. 487, 493, 256 S.W.3d 496, 501 (2007). Under this standard, the relevant time is when the security interest is perfected. *Id.* There is no dispute that Regions was first to perfect its security interest against the Old Entities. There is likewise no dispute that ARM was first to perfect its security interest against the New Entities and Day, individually.

ARM argues that the circuit court disregarded the corporate façade by finding that the partnerships were Day's alter egos. What should have followed, according to ARM, was a conclusion that the liens were valid only against Day individually. Because ARM held the only lien against Day individually, it argues it should be first in priority. To support this argument, ARM relies solely on *Winchel v. Craig*, 55 Ark. App. 373, 934 S.W.2d 946 (1996). In *Winchel*, to avoid tort liability, the owners of a corporation dissolved the entity and created a new entity that served the exact same purpose. *Id.* A jury concluded that the

---

[4]Though ARM did not raise these arguments below, we reject Regions' preservation argument. In a civil bench trial, a party who does not challenge the sufficiency of the evidence at trial does not waive the right to do so on appeal. *See, e.g.*, *Bohannon v. Robinson*, 2014 Ark. 458, at 5, 447 S.W.3d 585, 588.

new entity was a sham. *Id.* Accordingly, the corporate veil was pierced to hold the owners individually liable. *Id.*

We later cited *Winchel* with approval in *Anderson v. Stewart*, 366 Ark. 203, 234 S.W.3d 295 (2006). There, we noted that "[t]he doctrine of piercing the corporate veil is founded in equity and is applied when the facts warrant its application to prevent an injustice." *Id.* at 207, 234 S.W.3d at 298. Whether the corporate entity has been fraudulently abused is a question for the trier of fact, and the one seeking to pierce the corporate veil and disregard the corporate entity has the burden of proving that the corporate form was abused to his injury. *Id.* Common instances where the corporate form may be disregarded include when the entity attempted to hinder, delay, or defraud creditors, evade a contract obligation, or perpetuate fraud and injustice generally. *Id.*

The equitable principles underlying the doctrine of piercing the corporate veil and alter ego liability cut against ARM's assertion of priority. The trier of fact—here, the circuit court—concluded that the New Entities were a sham used to get around Regions' refusal to sign the subordination agreement. The circuit court held this case "came down to Scott Day or Scott Day Farms Partnership all the way through." As a result, Regions' lien was ongoing and had priority over ARM's later perfected lien.

This outcome is further supported by the circuit court's findings that both ARM and Day engaged in inequitable conduct toward Regions. The court found that ARM knew about Regions' lien on the Old Entities' crops and the substantial carryover from the 2014 season. To avoid Regions' lien, ARM pursued subordination in a manner the circuit court

8

characterized as unbusinesslike and imprudent. When Regions refused, ARM attempted to do indirectly what it could not do directly. That is, secure a first priority lien against the 2015 crop proceeds with Day's New Entities. The circuit court also found that ARM knew about Day's dishonesty. Under the circumstances of this case, the circuit court did not clearly err in concluding that the partnerships were Day's alter egos and that Regions held a priority lien against the 2015 crop proceeds.

ARM's fallback argument is that creditors who helped finance the 2015 crop are entitled to priority over those who did not. In other words, ARM insists that Regions cannot be paid first from the 2015 crop proceeds because Regions did not finance or help enable production. ARM contends this result sounds in equity. It cites only to a Mississippi bankruptcy case applying Louisiana law to determine whether a description of collateral was sufficient. *See Bayou Louie Farm, Inc. v. White* (*In re Heigle*), 401 B.R. 752 (Bankr. S.D. Miss. 2008). According to ARM, *Heigle* held that to allow a lender who did not finance the crop a priority lien on the crop would "give [the lender] a windfall by collecting proceeds on the sale of a crop for which it provided no financing." *Id.* at 778. Yet, as Regions points out, *Heigle*'s decision was not based on equity. Rather, the statement was made only after the court resolved the issue by determining that the collateral description was legally sufficient. *Id.*

We do not find *Heigle*'s dicta persuasive. This is especially true given our rejection of a similar argument in *Searcy Farm Supply*. In that case, an agricultural supplier sought super-priority over a bank's perfected lien. *See Searcy Farm Supply*, 369 Ark. at 492, 256 S.W.3d at

9

500. After concluding the supplier did not have super-priority status under UCC provisions, we refused to carve out an exception to the general "first to file" rule based on the supplier's assertion "that Arkansas law has long afforded a special priority to those who assist farmers with financing the planting, growing, and harvesting of their crops." *Id.* We determined that a rule of super-priority against a perfected security interest was a decision for the legislature. *Id.* at 496, 256 S.W.3d at 503.

The circuit court did not clearly err. We affirm on this point.

B.

We now turn to Optimum's lien against the 2015 crop proceeds. Everyone agrees that Optimum subleased farmland to the New Entities in 2015. The question is whether Optimum held a valid landlord lien on the crop. The circuit court ruled that it did. ARM's argument for reversal is premised on the validity of Optimum's lien. It first argues that Optimum, as a sublessor, could not hold a landlord's lien. ARM next argues that the sublease was invalid as a violation of Optimum's original lease with Hubbard Brake and thus unenforceable. Neither argument is persuasive.

There are two leases here. Neither involve ARM. In 2015, Hubbard Brake leased Hubbard Farm to Optimum. Optimum in turn subleased the land to the New Entities. The New Entities made an initial payment on the lease but defaulted on the remaining $79,750. Optimum timely asserted a landlord's lien. Hubbard Brake subsequently filed claims against Optimum. It alleged, among other things, that it had not approved the sublease and that it was entitled to a landlord's lien. These claims were dropped following a

10

settlement. As part of a consent judgment, Hubbard Brake would take assignment of any proceeds Optimum received under its lien claim.

An agricultural lease gives "every landlord" a lien on the crops grown upon the leased land for the rent due. *See* Ark. Code Ann. § 18-41-101(a). This statutory lien is not subject to Article 9. Instead, the legislature provided that a landlord lien has priority regardless of when a conflicting interest was perfected. *See* Ark. Code Ann. § 18-41-102(b)(1) (Repl. 2003); *see also Riceland Foods, Inc. v. Pearson*, 2009 Ark. 520, 357 S.W.3d 434. The lien is on the entire crop for the rent, regardless of whether the crop is raised by a tenant or subtenant and without regard to any agreement between the tenant and the subtenant. *See* 1 Howard W. Brill & Christian H. Brill, *Arkansas Law of Damages* § 25:7 (Nov. 2019 Update).

ARM contends, quite implausibly, that only the original landlord may assert a landlord's lien against a subtenant. Because Hubbard Brake owns the land and is the "original landlord," ARM argues that Optimum may not hold a landlord's lien against the New Entities. To support this argument, ARM relies on section 18-41-102, which provides that any subtenant is "responsible only for the rent of lands . . . cultivated or occupied by him or her." To be sure, this provision limits a subtenant's liability to the original landlord. It bars the original landlord from holding a subtenant liable for land not subject to the sublease. *See Watkins v. Wells*, 172 Ark. 696, 290 S.W. 593, 594 (1927). But it does not foreclose a sublessor from holding a landlord lien. *See Miller County Bank & Trust v. Beasley*,

165 Ark. 44, 262 S.W. 981, 982 (1924) (landowner's lien superior to sublessor's lien to the extent of pro rata part of rent due on land cultivated by subtenant).

ARM's argument altogether ignores the fact that "every landlord" shall have a landlord's lien. Though "landlord" is not statutorily defined, it is commonly defined as "[o]ne who leases property to another." *Black's Law Dictionary* 883 (7th ed. 1999); *see also Bank of McCrory v. Morrison* (*In Re James*), 368 B.R. 800, 804 (Bankr. E.D. Ark. 2006). Optimum's sublease to the New Entities easily satisfies this definition. Moreover, a sublease "involves the creation of a new tenancy between the sublessor and the sublessee, so that the sublessor is both a tenant and a landlord." *Jaber v. Miller*, 219 Ark. 59, 61, 239 S.W.2d 760, 761 (1951). Accordingly, the original landlord and the sublessor may both hold landlord liens against the subtenant. *See* 52A C.J.S. *Landlord & Tenant* § 1386 (Mar. 2020 Update).

Given that Optimum may hold a landlord's lien against the New Entities, we turn next to ARM's challenge to the validity of the sublease. This argument is premised on allegations made below by Hubbard Brake that Optimum violated the original lease by subleasing the land without its consent. Optimum denied each of Hubbard Brake's claims and there is no judgment addressing the validity of the original lease. The circuit court never considered, must less decided, whether the original lease was valid because Hubbard Brake and Optimum reached a settlement prior to trial. The circuit court therefore had no need to address the claims. Accordingly, it did not clearly err in concluding that Optimum was entitled to a landlord's lien against the 2015 crop proceeds.

12

Affirmed.

HART,                                    J.,                                    dissents.

**JOSEPHINE LINKER HART, Justice, dissenting.** I dissent. When Scott Day Farms Partnership, Beau and Shea Farms Partnership, and Matt and Holly Farms Partnership (the "Old Entities") defaulted on their financing agreement with Regions after the 2014 shortfall, Regions refused to finance the 2015 growing season. After this refusal, Regions should not be able to then—when production was only made possible through financing provided by another lender with a perfected security interest—assert a priority security interest in crop proceeds from the same growing season it refused to finance.

Row farmers generate revenue by growing and selling crops. Any farming operation will require capital resources, but shortfalls still happen. Note that Day did not resort to pursuing financing from ARM until Regions refused to supply financing after the 2014 shortfall. Then, ARM requested that Regions enter a subordination agreement before ARM would provide financing to the Old Entities for the 2015 growing season, but Regions refused. It was only then that Day utilized the New Entities to obtain financing from ARM for the 2015 growing season. As the majority notes, there is no dispute that Regions was first to perfect its security interest against the Old Entities (for the 2014 growing season), and there is no

13

dispute that ARM was first to perfect its security interest against the New Entities and Scott Day, individually (for the 2015 growing season).

The security agreements and promissory notes with Regions were both signed in the names of the Old Entities. None of the agreements with Regions were signed by Scott Day individually or any of the principals involved in the Old Entities. There is no indication that Regions had exercised any of its rights on default at the time Day obtained financing from ARM through the New Entities. Specifically, Regions had not reduced any claim it may have had against the Old Entities or against Day to judgment at the time Day obtained financing from ARM through the New Entities. In this situation, ARM has priority over Regions to the 2015 proceeds under the "first-in-time, first-in-right" rule.

I acknowledge the circuit court's determination that Scott Day switching from the "Old Entities" to the "New Entities" amounts to simply using these entities as his alter-egos, but this determination is in error. There is no indication of any impropriety at the time Regions entered its contracts with the Old Entities, or any other legal basis for disturbing the terms of those agreements. Day did not resort to utilizing the New Entities until after the 2014 shortfall and after Regions refused to finance the 2015 growing season. ARM points out the tension between the circuit court's decision in this respect. On the one hand, the circuit court disregarded the

business entities because Scott Day was the "sole ringleader/shot caller" for the New and Old Entities. But on the other, the circuit court gave Regions priority over ARM when ARM has a perfected security interest against Day individually and Regions does not.

Put simply, nothing in the record provides a legal basis for modifying the terms of Regions' agreements with the Old Entities to finance the 2014 growing season. Those documents speak for themselves, and they only provide Regions a security interest in crops produced by the Old Entities—not crops produced by Day or by the New Entities. There is no indication of impropriety or underhandedness with respect to the formation of these agreements with Regions. Legal entities need agents to function. Pieces of paper cannot farm. Accordingly, when Regions refused to finance the 2015 growing season, Day was free to go pursue financing either individually or through different entities from an alternative source. We cannot retroactively rewrite a validly entered contract to broaden one party's security interest so that it includes proceeds later generated by other parties who had no participation in the original contract.

But more broadly, giving Regions priority to the 2015 proceeds over ARM in this situation is simply inconsistent with the principles of equity upon which the alter-ego doctrine is based. It also undermines the confidence that a lending

15

institution can have in the required recording of financial documents. "The conditions under which the corporate entity may be disregarded or looked upon as the alter ego of the principal stockholder vary according to the circumstances of each case." *K.C. Properties of N.W. Arkansas, Inc. v. Lowell Inv. Partners, LLC*, 373 Ark. 14, 32, 280 S.W.3d 1, 15 (2008). "The doctrine of piercing the corporate veil is founded in equity and is applied when the facts warrant its application to *prevent an injustice*." *Id.* (emphasis added). In my view, the effect of the circuit court's decision is not to prevent an injustice. Instead, it allows a lender like Regions to "have its cake and eat it too."

The systemic problem here is the collateral description contained in Regions's financing agreement. This language would give Regions a security interest in "*[a]ll* crops; whether any of the foregoing is acquired *now or later*; whether any of the foregoing is *now existing or hereafter raised and grown*[,]" (emphasis added). This provision is so broadly written that it effectively transforms the bank's "security interest in collateral" into an undying right for the bank to collect any revenue the farmer ever generates until the debt is paid, with interest accruing all the while.

Security interests in after-acquired property, or "floating" liens as they are sometimes described,[1] are generally enforceable. Such contractual provisions are regularly utilized in other commercial industries where lenders can take a floating security interest in, for example, a business's "inventory." Obviously, the composition of the business's inventory will change after the extension of financing as the business continues day-to-day operations and sales. But in the context of agricultural lending for crop production, where the farmer's entire stream of revenue revolves around a single growing season each year, a floating security interest in "all crops" without relation to any particular growing season(s) is indefinite and subject to exploitation, as illustrated by the facts of this case.

Here, after refusing to finance Day's operations in wake of the 2014 shortfall, Regions lay in waiting until Day managed to obtain financing for the 2015 growing season through alternative means. Then, after the 2015 growing season was complete and Day had produced a new harvest of crops, Regions claims a priority security interest in the proceeds from the same growing season it refused to finance. Equity should not condone this sort of opportunistic maneuvering.

---

[1]"A security agreement that provides for a security in proceeds, in after-acquired property, or in collateral subject to future advances by the secured party (or all three) is often characterized as a *floating lien*." Roger Leroy Miller and Gaylord A. Jentz, *Fundamentals of Business Law: Excerpted Cases*, p. 431 (2009) (emphasis added).

Instead, equity would hold that Regions's floating security interest "crystallized" upon Day's default, and Regions could then exercise its rights and remedies, as set forth in the contract, to whatever collateralized assets existed at that time. "If the company defaults on its obligations under the terms of the loan agreement, the charge will *crystallize*, that is, immediately attach to the assets owned by the company at that time." *Collins Dictionary of Law*, "crystallize," W.J. Stewart (2006) (emphasis added); *see also Matter of Estate of Spears*, 314 Ark. 54, 61, 858 S.W.2d 93, 97 (1993) *dicta* ("Since the loan was not in default until February 1, 1991, no claim had crystallized against the estate until that time."). And *surely* Regions' security interest cannot continue "floating" after the bank refused to finance the 2015 growing season in the wake of the 2014 shortfall. Refusing to acknowledge this limitation encourages exploitative business tactics and discourages ongoing market activity. Neither law nor equity would allow Regions to have it both ways in this situation.

Hence, my disagreement with the circuit court's decision. It would be one thing to acknowledge the continuing validity and enforceability of a monetary judgment (for whatever debt exceeded the value of Regions' "crystallized" security interest in the 2014 crop proceeds) against the Old Entities (or perhaps even Day, if the right steps were taken) in favor of Regions. But acknowledging and affording

18

priority to a security interest in what was non-existent collateral—collateral which would never have existed but for another lender's willingness to do what the first lender was not—is quite another. If Regions has a priority security interest in the 2015 proceeds over ARM in this situation, then the incentives for each party's role are rendered perverse. A lender has no reason to continue doing business with an Arkansas farmer who goes through a shortfall if the security interest contained in their prior financing agreement will already entitle the lender to anything the farmer grows in the future. By that same token, a prospective lender has no reason to do business with a farmer who just went through a shortfall if anything the farmer grows in the future would go to the former lender who now refuses to participate. It is only predictable—and in this case, it was known—that a farmer in this situation will be forced to attempt to secure financing and generate revenue through a different entity. Would the lender prefer that the farmer simply declare bankruptcy? Surely equity does not favor the perpetuation of this untenable reality.

I dissent.

*Gill Law Firm, PLC*, by:  *Brooks A. Gill* and *Kelly K. Brown*, for appellant Hampton Pugh Company, LLC.

*Waddell, Cole & Jones, PLLC*, by:  *Ralph W. Waddell* and *Justin E. Parkey*, for appellant Agrifund, LLC.

*Bridges, Young, Matthews & Drake PLC*, by:  *John T. Talbot*, for appellee.