Cite as 2024 Ark. App. 513

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CV–21–614

| | |
|---|---|
| RICHARD MAYS, JR.; MAYS, BYRD & ASSOCIATES, P.A.; DERRICK STEPHENS; D. STEPHENS MANAGEMENT & CONSULTING, LLC; AND OLENA "LOLA" KORNEEVETS<br><br>APPELLANTS<br><br>V.<br><br>VIVA LA VEGAN GROCERY, INC.<br>APPELLEE | Opinion Delivered  October 23, 2024<br><br>APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, SIXTH DIVISION<br>[NO. 60CV-17-7189]<br><br>HONORABLE TIMOTHY DAVIS FOX, JUDGE<br><br>AFFIRMED IN PART; REVERSED AND DISMISSED IN PART |

**MIKE MURPHY, Judge**

This appeal is about an investment deal gone bad. Viva La Vegan Grocery, Inc. ("VLV"), agreed to invest $290,000, and D. Stephens Management & Consulting, LLC ("DSMC"), promised to use VLV's funds to obtain a standby letter of credit ("SBLC"), which DSMC, in turn, would "monetize" by using the SBLC as leverage to obtain a larger amount of money and return on VLV's investment. To facilitate this arrangement, VLV and DSMC entered into an escrow agreement for the law firm of Mays, Byrd & Associates, P.A. ("MBA"), through attorney Richard L. Mays, Jr. ("Mays, Jr."), to act as escrow holder of VLV's funds. VLV deposited its $290,000 investment into MBA's IOLTA trust account and received back neither its principal investment nor any return on that investment.

VLV subsequently filed a civil action in the Pulaski County Circuit Court to recover its missing money. The circuit court entered a default judgment as to liability against defendants DSMC, Derrick Stephens ("Stephens"), and Olena "Lola" Korneevets ("Korneevets"). Over two years later, and after a two-day bench trial, the circuit court entered judgment against defendants MBA and Mays, Jr.[1] and awarded compensatory damages of $290,000 against all five defendants and punitive damages of $870,000 against defendants DSMC, Stephens, and Mays, Jr. The five defendants bring this appeal from the circuit court's judgment. We affirm the judgment except with respect to the circuit court's findings on the claim against Mays, Jr. for constructive trust and equitable lien based on unjust enrichment, which we reverse and dismiss.

I. *Standard of Review*

Following a bench trial, we determine whether the circuit court's findings were clearly erroneous or clearly against the preponderance of the evidence, and we review the circuit court's conclusions of law de novo. *Gunn v. Wortman*, 2024 Ark. App. 111, at 6, 684 S.W.3d 340, 343–44. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court, on the entire record, is left with a firm conviction that a mistake has been made. *Id*. We view the evidence and all reasonable inferences arising therefrom in the light most favorable to the appellee. *AgriFund, LLC v. Regions Bank*, 2020 Ark. 246, at 6, 602 S.W.3d 726, 730. When there are two permissible views of the evidence,

_____

[1]On March 17, 2023, VLV filed a suggestion of death upon the record pursuant to Arkansas Rule of Appellate Procedure–Civil 12, noting the recently discovered death of separate appellant Mays, Jr. on December 19, 2022. On April 5, 2023, we issued an order noting the suggestion of death upon the record.

the fact-finder's choice between them cannot be clearly erroneous. *Rymor Builders, Inc. v. Tanglewood Plumbing Co., Inc.*, 100 Ark. App. 141, 147, 265 S.W.3d 151, 155 (2007). We give recognition to the circuit court's superior opportunity to determine the credibility of witnesses and the weight to be given to their testimony. *Gunn*, 2024 Ark. App. 111, at 6, 684 S.W.3d at 344.

## II. *Procedural and Factual Background*

On December 12, 2017, VLV filed its complaint alleging ten causes of action against each defendant: (1) negligence; (2) breach of contract; (3) breach of fiduciary duty; (4) conversion; (5) civil conspiracy; (6) fraud and misrepresentation; (7) violation of the Arkansas Deceptive Trade Practices Act; (8) violation of the Arkansas Securities Act; (9) civil action by crime victim; and (10) constructive trust and equitable lien based on unjust enrichment. The complaint sought compensatory damages in the amount of $290,000; punitive damages; pre- and postjudgment interest, attorneys' fees and costs; and the imposition of a constructive trust and equitable lien. All defendants were properly served with the complaint and summonses. On February 8, 2018, MBA and Mays, Jr. filed separate answers to the complaint, and Mays, Jr. filed a cross-claim for breach of contract and contribution and indemnity against DSMC, Stephens, and Korneevets. Neither DSMC, nor Stephens, nor Korneevets filed an answer or other responsive pleading.

On March 27, 2019, VLV moved for a default judgment against DSMC, Stephens, and Korneevets. On April 10, 2019, DSMC and Stephens entered an appearance and filed a response affirmatively stating that they had no objection to entry of a default judgment against them. On May 17, 2019, the circuit court entered judgment by default against

3

DSMC, Stephens, and Korneevets as to liability on all ten counts and reserved its determination of appropriate damages for a later hearing.

On August 11 and 12, 2021, the circuit court conducted a bench trial where the following relevant testimony and evidence was presented. VLV was a vegan grocery store owned and operated by Isaak Iftikhar[2] in California. In 2015, to expand its business, VLV obtained a loan in the amount of $290,000 from A Well-Fed World, Inc. ("AWFW"), a Washington, D.C., nonprofit corporation dedicated to hunger relief and environmental advocacy using plant-based solutions.[3] Iftikhar was acquainted with Korneevets through the vegan community in California, and he understood that Korneevets's spouse and business partner, Stephens, could provide investments. Accordingly, in early 2015, Iftikhar met with Korneevets and Stephens to discuss investing the $290,000 loan to VLV from AWFW.

After reviewing the AWFW/VLV loan agreement, Korneevets and Stephens proposed an investment arrangement through which, they represented, they could obtain a very large return on VLV's $290,000 investment in a very short time and with very little risk. The deal involved DSMC using VLV's money "to obtain an SBLC for monetizing purposes." Korneevets and Stephens explained to Iftikhar that the SBLC, which they described as a bank document that guarantees funds to a client, would be monetized by using it as leverage to obtain a larger amount of money and return on investment. They told

---

[2]At the time that the complaint was filed, Iftikhar, individually, was a party plaintiff, but he later voluntarily dismissed his individual claims.

[3]AWFW originally received the money that it loaned to VLV from the OM Foundation Limited, an entity that invests in vegan businesses and disburses profits to other charities.

4

Iftikhar that, to carry out the deal, VLV's investment would be placed into an escrow account where it would earn interest. If the SBLC could not be carried out, then VLV's $290,000 would be returned, along with the interest then accrued in the account.

This investment arrangement was memorialized in a "Funding Agreement" signed on February 12, 2015, by Iftikhar on behalf of VLV and by Stephens on behalf of DSMC. The terms of the agreement provided as follows:

> This FUNDING AGREEMENT ("Agreement") is made and effective as of February 12, 2015 ("Effective Date"), by and between VIVA LA VEGAN GROCERY CORP ("VLV") and D STEPHENS MANAGEMENT & CONSULTING ("DS"), VLV and DS may sometimes hereafter be referred to as "Party" or "Parties".
>
> **1. The Investment.** VLV shall invest the sum of Two Hundred and Ninety Thousand Dollars ($290,000.00) ("Funding") with DS. DS shall use said Funding to obtain a SBLC for monetizing purposes.
>
> **2. Term.** The term of this Agreement shall commence on the Effective Date and shall continue until monetizing SBLC, approximately 14 calendar days.
>
> **3. Deal Structure.** As full and complete consideration for Investor entering into this Agreement and for making the Funding necessary to initiate SBLC process:
>
> a. Investor shall receive a return totaling to a sum of Two Million Two Hundred and Twenty-Five Thousand Dollars ($2,225,000.00) in two tranches, as follows:
>
>> I. Investor shall receive as "first money out" the investment principal of $290,000.00 (Two Hundred Ninety Thousand) plus a 22% equal to $63,800.00 (Sixty-Three Thousand Eight Hundred) preferred return totaling the sum of $353,800.00 (Three Hundred Fifty-Three Thousand Eight Hundred) as specified in Section 3 of the **Escrow Funds Release Agreement**.
>>
>> II. Investor shall receive $1,871,200.00 (One Million Eight Hundred Seventy-One Thousand and Two Hundred) at the end of the Term as specified in **Paragraph 2** of this **Funding Agreement** (this applies to the Investor and/or their assignees).

**4. Indemnity.** DS hereby defends, indemnifies and holds VLV harmless from any and all claims, judgments, losses, expenses (including reasonable outside attorneys' fees), and liabilities of or against Investor arising out of any impending lawsuits or judgments except where such claims, judgments, losses, expenses, and liabilities result directly from Investor's willful misconduct, negligence, recklessness, knowing or reckless misrepresentations, fraud, or proven criminal conduct.

**5. No Equitable Relief.** In the event of a breach of this Agreement, Investor's remedies shall be limited solely to an action at law for monetary damages actually suffered, if any. In no event shall Investor be entitled to (a) seek or obtain injunctive or other equitable relief in connection herewith or with the SBLC or any rights therein, thereto, or in connection therewith, or any rights granted or agreed to be granted herein, or (b) restrain or otherwise interfere with the SBLC transaction, any rights therein, thereto, and/or in connection therewith, or any rights granted or agreed to be granted herein.

**6. No Authority.** VLV acknowledges and agrees that VLV has no rights or authority to negotiate on behalf of DS and that VLV will not enter into any agreements whatsoever on behalf of DS outside of this Agreement.

**7. Relationship of Parties.** DS and VLV each acknowledge that they are independent contractors and that no partnership, joint venture, agency or employment relationship has or will be created by this Agreement. It is expressly agreed and understood that VLV is not acting under the direct supervision and control of DS. As such, VLV agrees that it shall be solely responsible for any and all taxes and other payments due related to payments received from DS hereunder.

**8. Miscellaneous.** This Agreement shall be governed by and construed in accordance with the laws of the State of California. The parties agree and consent that the jurisdiction and venue of all matters relating to this Agreement will be vested exclusively in the federal, state and local courts within the State of California. This Agreement contains the entire understanding of the Parties relating to its subject matter. No change or modification of this Agreement will be binding upon either Party unless it is made by written instrument. A waiver by either Party of any provision of this Agreement in any instance shall not be deemed to waive such provision for the future. All remedies, rights, undertakings, and obligations contained in this Agreement shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, or obligation of either Party. Should any provision of this Agreement be determined to be void, it shall not affect the validity of any other provision of this Agreement.

The same day, VLV and DSMC executed a second agreement regarding escrow

services to carry out the Funding Agreement. This agreement provided as follows:

THIS AGREEMENT (hereinafter the "Agreement") is made and entered into as of February 12, 2015 by and between Viva La Vegan ("VLV"), and D Stephens Management & Consulting, LLC ("DS"). VLV and DS are each a "Party" and collectively the "Parties."

WITNESSETH:

WHEREAS, the Funding Agreement was entered into on February 12, 2015 by VLV and DS.

WHEREAS, the Funding Agreement requires a good faith deposit of $290,000.00 (Two Hundred and Ninety Thousand Dollars) (the "Deposit") to be provided to Mays Bryd and Associates, as the Escrow Holder.

WHEREAS, VLV shall be furnishing the Deposit required under the Funding Agreement, on behalf of DS, to Mays Byrd and Associates, as the Escrow Holder.

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein and for other good and valuable consideration, the adequacy and sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound, hereby agree as follows:

The Parties agree that VLV is the owner of the Deposit (said amount, inclusive of interest earned thereon) and shall retain ownership until the disbursement of the Deposit per the Funding Agreement.

The Escrow Holder shall hold and disburse the Deposit (said amount, inclusive of interest earned thereon) in accordance with the terms of the Funding Agreement. In the event that the Funding Agreement requires that the Deposit be returned to VLV, then the Escrow Holder shall return and disburse the Deposit (said amount, inclusive of interest earned thereon) to VLV rather than to DS.

If a dispute arises as to the payment of the Deposit arising out of this Agreement or the Funding Agreement, the Escrow Holder shall be entitled to interplead the Deposit into the Court in Arkansas, and to

7

pay attorneys' fees, filing fees and court costs incurred by Escrow Holder in such interpleader action, whereupon Escrow Holder shall be released from any further liability or obligations hereunder.

DS shall have the right to enforce DS's rights with respect to the Deposit in the event a dispute arises in connection with the Funding Agreement. VLV acknowledges that it has reviewed the Funding Agreement and is familiar with and understands all of the terms of the Funding Agreement. Further, VLV acknowledges and agrees that once the Deposit becomes nonrefundable to DS under the terms of the Funding Agreement, the Deposit (and any interest thereon) are to be applied to the funding agreement if the Closing occurs.

This escrow agreement was signed by Stephens on behalf of DSMC, by Iftikhar on behalf of VLV, and by "Richard Mays, Jr., Esq." as accepted by "Escrow Holder: Mays, Byrd and Associates." The agreement included an attachment providing the "Paymaster Banking Coordinates" for a Bank of America account named "Mays, Byrd and Associates IOLTA IV" with an account number ending in 1860 ("MBA IOLTA IV 1860").

On February 17, 2015, VLV wired the $290,000 deposit directly into MBA IOLTA IV 1860. According to Iftikhar, after the expiration of the fourteen-day period specified in the Funding Agreement, nothing happened. Korneevets and Stephens told Iftikhar that, due to various processing delays, they were not able to monetize the SBLC, but they assured him that VLV's deposit would continue to sit in the escrow account earning interest.

In early fall of 2015, Iftikhar started to worry because VLV still had not received any of the return as promised in the Funding Agreement. He explained that he had to use his own funds, as well as a personal loan of $10,000 from Stephens, just to keep the business running over the summer of 2015. Accordingly, in September 2015, he requested a return of VLV's $290,000 deposit. At that point, Stephens disclosed for the first time that VLV's money was no longer in the escrow account but instead had been deposited in Soliel

Chartered Bank. Still, he assured Iftikhar that VLV's money would be returned to MBA IOLTA IV 1860 by October 2, 2015, and then promptly wired directly to VLV's Chase Bank account. VLV's money, however, was not returned to MBA IOLTA IV 1860 or to VLV's Chase Bank account. Iftikhar learned instead that, on October 1, 2015, Stephens had deposited a $300,000 check (for "legal fees," according to its memo line) into MBA IOLTA IV 1860, but the check never cleared. And in the weeks that followed, Stephens gave numerous inconsistent and conflicting explanations regarding the missing money. In mid-October 2015, Iftikhar contacted Mays, Jr. directly about the missing $290,000 that he, on behalf of MBA as the escrow holder, was obligated to hold in MBA IOLTA IV 1860 for VLV. But Mays, Jr. claimed to know nothing about VLV's money.

AWFW and the OM Foundation Limited ultimately got involved in the search for the $290,000 that had been loaned to VLV. In the spring of 2016, they hired Shawn Kowalewski, a Wells Fargo Advisors investment officer, and Mike Smith, an attorney at Baker Donelson Law Firm, to investigate and attempt to recover the missing money. Kowalewski and Smith said that bank documents provided by Mays, Jr. showed money was "coming and going in and out of" MBA IOLTA IV 1860, and neither the amounts of the transactions nor Mays, Jr.'s explanations added up.[4] At one point during their investigation, Mays, Jr. stated that there was a second escrow agreement executed in December 2014 between him (Mays, Jr.) and DSMC/Stephens—one to which VLV was not a party.[5] He

---

[4]Numerous bank records and emails relating to the transactions were admitted at trial.

[5]In this agreement, Mays, Jr. agreed, as escrow agent, to hold funds for DSMC in his IOLTA trust account, and DSMC agreed to pay Mays, Jr. $5,000 for providing escrow

told Kowalewski and Smith that every transaction he did with Stephens was under this separate escrow agreement and that the disbursements "were all confidential and involved other transactions that were going on," explaining that he had been doing several other transactions with Stephens "for some period of time." He later backstepped this story, claiming instead to have made disbursements of VLV's money only under the February 2015 escrow agreement between VLV and DSMC but at the direction of Stephens. According to Kowalewski and Smith, during a July 2016 telephone conference, Richard Mays, Sr., a managing partner of MBA, acknowledged that money was missing from MBA's IOLTA trust account but refused to provide any additional information or any solution regarding what he was willing to do on behalf of his law firm.

Mays, Jr.'s deposition testimony was used at trial due to his unavailability for health reasons. In his deposition, Mays, Jr. confirmed that VLV had deposited $290,000 into his MBA IOLTA trust account in February 2015. As to what he did with that money after it was deposited, he said that he followed Stephens's instructions to transfer $210,000 to Zeba, LLC; $30,000 to Stephens through AMS Energy, LLC; $39,960 to Irene and Juan Gonzalez; and $10,000 to Iftikhar. Mays, Jr. testified that he made these disbursements, at the sole direction of Stephens, and he did not notify Iftikhar/VLV either before or after he made the transactions. He stated that all these disbursements, except for the $10,000 to Iftikhar,

---

services. The agreement was executed on December 13, 2014, and VLV was not a party to it.

10

were made within fourteen days of VLV's $290,000 deposit.[6] He further admitted that he previously claimed to have transferred a total of $300,000 from his MBA IOLTA trust account, including $50,000 to Madean Law Firm; $100,000 to Peter Shahi; and another $150,000 to Peter Shahi. He testified that he provided Kowalewski documentation of these transfers at Stephens's instruction regarding an explanation as to how VLV's $290,000 had been disbursed.

Mays, Jr. also testified about a separate escrow agreement that he and Stephens executed in December 2014 and to which VLV was not a party. Under the December 2014 escrow agreement, Mays, Jr. received a fee of $5,000 as compensation for providing escrow services relating to Stephens's transactions. As to the February 2015 escrow agreement relating to VLV's investment, Mays, Jr. testified that he and Stephens had a verbal agreement that he would receive a percentage of the profit on VLV's investment as compensation for providing escrow services. He admitted that neither the Funding Agreement nor the February 2015 escrow agreement provided for this compensation arrangement and that VLV/Iftikhar was not informed about the verbal agreement.[7]

---

[6]Online banking records admitted at trial show that $10,000 was withdrawn from Mays, Jr.'s trust account and wired into Iftikhar's Gold One Credit Union account on July 13, 2015.

[7]Stephens testified at trial that he and Mays, Jr. had "a side agreement" for Mays, Jr. to receive "a quarter percent" of the profits on VLV's investment as compensation for providing escrow services.

11

Mays, Jr. also admitted that he had incorporated AMS Energy, LLC—an entity to which he had transferred $30,000 of VLV's money.[8] He further acknowledged that, as late as 2016, AMS Energy's website listed him as both general counsel and senior management for the corporation. A printout from AMS Energy's website, which was introduced through Stephens's trial testimony, also included statements that "Richard L. Mays, Jr. is an associate with the law firm of Mays, Byrd & Associates, P.A.," and "Mr. Mays provides legal support on all deal documentation and transactions."[9]

At trial, Stephens admitted that he never obtained an SBLC as outlined in the Funding Agreement. He claimed instead that, on February 19, 2015, $210,000 of VLV's money was transferred to Zeba, LLC, for a fuel deal, and not for an SBLC. For the first time, he presented documents showing that, in his role as managing partner of AMS Energy, he had signed a fuel contract with Zeba for which VLV's money purportedly was to be used. He insisted that Iftikhar/VLV was both aware of, and on board with, this fuel deal. The fuel contract between AMS Energy and Zeba, however, was executed *before* the Funding Agreement relating to VLV's investment, and the Funding Agreement included no

---

[8]AMS Energy's corporate records with the Arkansas Secretary of State, which were admitted through Stephens's trial testimony, show that Mays, Jr. formed the corporation in 2010, designating MBA as the registered agent and himself and Stephens as corporate managers. The records also show that less than three months before the first trial setting in June 2019, Stephens changed AMS Energy's designated registered agent from MBA to himself.

[9]At trial, Stephens, too, admitted that Mays, Jr. had transferred $30,000 of VLV's money from MBA IOLTA IV 1860 to AMS Energy on February 19, 2015.

mention of any fuel deal. Stephens further testified that the fuel deal ultimately was unsuccessful and that $209,000 of the $210,000 was returned to him personally. He admitted, however, that he previously testified in his deposition that this money was returned to MBA IOLTA IV 1860, "so [VLV] didn't lose those funds at all. Just like I stated to him he wouldn't." At the end of the day, the circuit court concluded that Stephens had "zero credibility. Zero. Drafts of agreements, conversations, hearsay conversations with people. I don't know how many times he should be charged with securities fraud, or whether it's too late for that. But zero."

On August 16, 2021, the circuit court entered judgment in VLV's favor against Mays, Jr. as to count I (negligence), count II (breach of contract), count III (breach of fiduciary duty), count IV (conversion), count VI (fraud and misrepresentation), and count X (constructive trust and equitable lien); and against MBA as to count I (negligence), count II (breach of contract), and count III (breach of fiduciary duty). The court awarded compensatory damages in the amount of $290,000 against all five defendants, jointly and severally, and punitive damages in the amount of $870,000 against Mays, Jr., Stephens, and DSMC, jointly and severally. The court also granted Mays, Jr.'s cross-claim against DSMC and Stephens for contribution in the amount of the $290,000 in compensatory damages, together with any attorneys' fees and costs assessed against Mays, Jr.

### III.  *Mays, Jr.'s Cross-Claim*

Joint appellants DSMC, Stephens, and Korneevets argue that the circuit court lacked jurisdiction to enter judgment on Mays, Jr.'s cross-claim because the cross-claim was never served on them. On February 8, 2018, Mays, Jr. filed his answer and cross-claim against

DSMC, Stephens, and Korneevets, alleging two counts: (1) breach of contract and (2) contribution and indemnity. As to the second count, Mays, Jr. asserted that "in the event it is adjudged that he has any liability to the Plaintiffs, he is entitled to contribution and indemnity from Cross Defendants Stephens, DSMC and Korneevets from all sums adjudged against [him]." As noted, the circuit court entered a default judgment against DSMC, Stephens, and Korneevets on May 17, 2019; and in its August 16, 2021 judgment, it awarded damages against all five defendants; granted, in part, the cross-claim against DSMC and Stephens for contribution in the amount of $290,000, plus any attorneys' fees costs assessed against Mays, Jr.; and dismissed the cross-claim against Korneevets.

While valid process is necessary to give a court jurisdiction over a defendant, the defense of personal jurisdiction may be waived by the appearance of the defendant without raising an objection. *Wilmington Sav. Fund Soc'y, Tr. for BCAT 2015-4-BTT v. Smith*, 2023 Ark. App. 326, at 13, 669 S.W.3d 840, 848. We have long recognized that any action on the part of a defendant, except to object to jurisdiction, which recognizes the case in court, will amount to an appearance. *Id.*, 669 S.W.3d at 848–49. A determining factor in deciding whether a defendant has waived his rights and entered an appearance is whether the defendant seeks affirmative relief. *Cogburn v. Marsh*, 2023 Ark. App. 114, at 4, 663 S.W.3d 404, 407. The pleading that is filed must be more than a defensive action that is inconsistent with a defendant's assertion that the circuit court lacked personal jurisdiction over him. *Id.* at 5, 663 S.W.3d at 407–08. The most obvious examples are counterclaims, cross-claims, and third-party claims in which a defendant invokes the jurisdiction of the court and thereby submits to it. *Id.* at 5, 663 S.W.3d at 408.

14

On April 10, 2019, DSMC and Stephens, through attorney Don Lloyd Cook, entered an appearance for the limited purpose of responding to VLV's motion for default judgment. In their response, they stated that they had no objection to a default judgment and, in their prayer for relief, asked the circuit court to "grant the Entry of Default Judgment as requested in Plaintiff's Motion[.]" The circuit court granted the default judgment and later denied attorney Cook's request for permission to withdraw as counsel. Stephens thereafter appeared (without counsel, nevertheless) and testified at the August 11–12, 2021 bench trial. DSMC and Stephens contend that the cross-claim first came to light at trial when, during a conversation regarding the use of Mays, Jr.'s deposition testimony, Mays, Jr.'s attorney reminded the circuit court that a cross-claim against defendants Stephens, DSMC, and Korneevets was filed on February 8, 2018. Stephens, however, made no objection, argument, or statement with respect to service or notice of the cross-claim.

It is well settled that a party generally must object at the first opportunity to preserve an issue for appeal. *Wilmington Sav. Fund Soc'y*, 2023 Ark. App. 326, at 14, 669 S.W.3d at 849. DSMC and Stephens recognized the case as being in court and entered their appearance by agreeing to the entry of a default judgment. *See Trelfa v. Simmons First Bank of Jonesboro*, 98 Ark. App. 287, 292, 254 S.W.3d 775, 779 (2007) (holding that agreeing to the entry of an order appointing a receiver amounted to entry of appearance). They also raised no argument and, thus, obtained no ruling on their personal-jurisdiction challenge based on lack of service. *See, e.g.*, *Taffner v. Ark. Dep't of Hum. Servs.*, 2016 Ark. 231, at 11, 493 S.W.3d 319, 327 (holding that absent a specific ruling by the circuit court, there was nothing for this court to review); *see also* Ark. R. Civ. P. 12(h)(1) (stating that a defense of lack of

15

jurisdiction over the person, insufficiency of process, or insufficiency of service of process is waived if neither made by motion under this rule nor included in the original responsive pleading). For these reasons, we do not consider appellants' newly asserted personal-jurisdiction defense.

## IV. *Forum-Selection Clause*

Appellant Mays, Jr. and joint appellants DSMC, Stephens, and Korneevets argue that the circuit court lacked jurisdiction because of a forum-selection clause in the Funding Agreement, which, in pertinent part, states as follows:

> This Agreement shall be governed by and construed in accordance with the laws of the State of California. The parties agree and consent that the jurisdiction and venue of all matters relating to this Agreement will be vested exclusively in the federal, state and local courts within the State of California.

This issue was raised for the first at the start of the bench trial on August 11, 2021, when Mays, Jr.'s attorney orally moved to dismiss VLV's complaint for lack of subject-matter jurisdiction pursuant to Arkansas Rule of Civil Procedure 12(b)(1). We hold that the circuit court properly denied the motion.

We note at the outset that the parties to the Funding Agreement were VLV and DSMC. DSMC, Stephens, and Korneevets requested, and were granted, a default judgment against themselves over two years before Mays, Jr. raised a defense of subject-matter jurisdiction based on the forum-selection clause. For good reason, DSMC, Stephens, and Korneevets did not join in Mays, Jr.'s motion to dismiss. In any event, to the extent that Mays, Jr. had standing to rely on a forum-selection clause contained in an agreement to which he was not a party, his Rule 12(b)(1) motion to dismiss did not invoke the court's subject-matter jurisdiction. Parties may by agreement consent to personal jurisdiction in a

16

given court, but subject-matter jurisdiction cannot be conferred merely by agreement of the parties. *Roller v. TV Guide Online Holdings, LLC*, 2013 Ark. 285, at 4. While a forum-selection clause implies consent as to personal jurisdiction, it cannot confer subject-matter jurisdiction. *Id*. Subject-matter jurisdiction also may not be created by agreement of the parties. *Id*.

Further, to the extent that appellants now assert a personal-jurisdiction challenge based on the forum-selection clause, their failure to raise the argument below precludes review of the issue on appeal. *Brown v. Lee*, 2012 Ark. 417, at 7, 424 S.W.3d 817, 821. Appellants are bound by the scope and nature of the arguments made at trial; they cannot change the grounds for a motion on appeal. *Id*. And even assuming, arguendo, that Mays, Jr.'s motion to dismiss had raised a personal-jurisdiction defense under Rule 12(b)(2), its denial still would have been proper because any personal-jurisdiction challenge was waived by the clear failure to timely raise the issue. *Elaine Petroleum Distrib., Inc. v. Snyder*, 2022 Ark. App. 59, at 9–11, 640 S.W.3d 704, 712–13 (holding lack-of-personal-jurisdiction defense waived when not raised at the first opportunity). The motion to dismiss was made for the first time at trial, after over three and a half years of litigation and after a default judgment had already been entered against DSMC, Stephens, and Korneevets. Accordingly, we affirm the circuit court's decision denying the motion to dismiss.

V.  *Common-Defense Doctrine*

Joint appellants DSMC, Stephens, and Korneevets challenge the circuit court's entry of a default judgment against them, arguing that Mays, Jr.'s and MBA's timely answers inured to their benefit under the common-defense doctrine. *See, e.g.*, *Macom v. Di Cresce*,

17

2023 Ark. App. 530, at 8, 680 S.W.3d 36, 41 (explaining that, under the common-defense doctrine, an answer that is timely filed by a codefendant inures to the benefit of a defaulting codefendant). Appellants, however, did not raise this argument in the circuit court. To the contrary, they affirmatively stated that they had no objection to entry of a default judgment, and they never asked to have the default judgment set aside. In short, because appellants did not raise this argument below, we are precluded from considering it on appeal. *See, e.g.*, *Jean-Pierre v. Plantation Homes of Crittenden Cnty., Inc.*, 350 Ark. 569, 574, 89 S.W.3d 337, 340 (2002) (holding failure to raise common-defense-doctrine argument below preluded review of argument on appeal).

## VI. *Motion for Continuance*

Appellant Mays, Jr. argues that the circuit court abused its discretion in denying his request to continue the August 11–12, 2021 bench trial because his medical condition constituted "good cause" for a continuance. On June 25, 2021, Mays, Jr. filed (under seal) a written motion requesting a continuance of the August 2021 trial setting until such time that he was able (1) to participate in the preparation for, and defense of, the case; (2) to attend the trial; and (3) to participate as the trial progressed and evidence was presented. He alleged that his ongoing and worsening medical issues prevented him from doing these things. The circuit court denied the motion in a written order filed on July 28, 2021. Mays, Jr.'s attorney renewed the motion at the beginning of trial, arguing that, for the reasons stated in his written motion, Mays, Jr. was unable to attend the trial and that proceeding in his absence would result in a violation of due process, fundamental fairness, and fundamental justice. The circuit court ruled from the bench, noting that the case was filed in 2017 and

18

had been going on for four years, "so in balancing everyone's due-process rights, the Court made the decision that that motion would be denied then, and the oral renewal is denied as well."

The decision to grant or deny a motion for continuance is within the sound discretion of the circuit court, and this court will not reverse the circuit court's decision absent an abuse of discretion amounting to a denial of justice. *Dollar Gen. Corp. v. Elder*, 2020 Ark. 208, at 12, 600 S.W.3d 597, 605. An abuse of discretion is a high threshold that does not simply require error in the circuit court's decision but requires that the circuit court act improvidently, thoughtlessly, or without due consideration. *Id.* An appellant must show prejudice from the denial of a continuance, and the burden of showing prejudice is on the appellant. *Id.*

A court "may, upon motion and for good cause shown, continue any case previously set for trial." Ark. R. Civ. P. 40(b). A circuit court, however, has an obligation to manage and control its docket in an efficient manner. *Frost v. Frost*, 2009 Ark. App. 290, at 4, 307 S.W.3d 41, 44. And we have recognized that "it is crucial to our judicial system that trial courts retain the discretion to control their dockets." *Id.*

Mays, Jr.'s June 25, 2021 written motion for continuance (and its renewal at trial) was not his first request to continue the trial in this case. A bench trial previously had been scheduled for June 5–6, 2019. That setting was continued the day before it was to begin because of a medical emergency Mays, Jr. suffered the night before. Mays, Jr.'s medical issues that began in June 2019 proved to be chronic, resulting in a delay of more than two years before the trial ultimately was rescheduled for August 11–12, 2021. When Mays, Jr.

19

requested yet another continuance, he offered no evidence from which the circuit court could have determined, with any degree of certainty, that his ongoing medical issues were likely to improve such that he ever would be able to attend the trial, participate in his defense, and testify. Moreover, because of Mays, Jr.'s health-related unavailability, the circuit court permitted use of his April 22, 2019 deposition testimony at trial and let his attorney designate the portions of the deposition transcript for the court to consider. *See* Ark. R. Civ. P. 32(a)(3)(C) (permitting use of deposition of a witness, whether or not a party, when the witness is unable to attend or testify because of age, illness, infirmity, or imprisonment). Given the significant delay involved in this case, the uncertain prognosis for improvement in Mays, Jr.'s health, and the availability and use of Mays, Jr.'s deposition testimony at trial, we cannot say that the circuit court's decision to move the case forward constituted an abuse of discretion. *See Hamm v. Hamm*, 2013 Ark. App. 501, at 8, 429 S.W.3d 384, 389 (holding that circuit court did not abuse its discretion in denying continuance when there had been a five-year delay in proceedings, substantive issues were briefed before the hearing, counsel appeared on absent party's behalf, and there was no proffer showing why denial of justice might ensue in the party's absence).

## VII. *Mays, Jr.'s Liability*

Mays, Jr. challenges the circuit court's findings regarding his liability for negligence, breach of contract, breach of fiduciary duty, conversion, fraud and misrepresentation, and constructive trust and equitable lien based on unjust enrichment. For the reasons set forth below, we affirm the circuit court's findings as to negligence, breach of contract, breach of

fiduciary duty, conversion, and fraud and misrepresentation; and we reverse and dismiss its findings as to constructive trust and equitable lien based on unjust enrichment.

## A. Negligence

To prove negligence, there must be a failure to exercise proper care in the performance of a legal duty that the defendant owed the plaintiff under the circumstances surrounding them. *Wochos v. Woolverton*, 2010 Ark. App. 802, at 16, 378 S.W.3d 280, 289. The law of negligence requires as essential elements that the plaintiff show that a duty was owed and that the duty was breached. *Id.* Duty is a concept that arises out of the recognition that relations between individuals may impose upon one a legal obligation for the other. *Id.* at 16, 378 S.W.3d at 289–90. The question of what duty is owed is one of law that is reviewed de novo. *Id.* at 16, 378 S.W.3d at 289.

An escrow agent is the agent of both parties to a transaction and is charged with the duty of carrying out the terms and conditions of the escrow agreement. *Id.* at 15, 378 S.W.3d at 289. As such, an escrow agent is in a relationship of confidence, which it cannot violate to its own advantage or to the detriment of either principal. *Id.* "[A]n agent, regardless of how innocent his intentions may be, cannot place himself in a situation where personal interests conflict with the duties owed his principal." *Collins v. Heitman*, 225 Ark. 666, 672, 284 S.W.2d 628, 633 (1955).

The testimony and evidence sufficiently demonstrate that Mays, Jr., on behalf of MBA, agreed to serve as an escrow agent for VLV and DSMC relating to the Funding Agreement between VLV and DSMC. As an escrow agent, Mays, Jr./MBA owed a duty to carry out the terms of the escrow agreement. The terms of the escrow agreement required

21

Mays, Jr./MBA to "hold and disburse" VLV's $290,000 deposit (including interest earned thereon) "in accordance with the terms of the Funding Agreement." The terms of the Funding Agreement provided only that Mays, Jr./MBA was to disburse the return on VLV's $290,000 deposit *to VLV*. Moreover, the February 2015 escrow agreement relating to VLV's investment provided that, if the Funding Agreement required return of the deposit to VLV, then Mays, Jr./MBA "shall return and disburse" the deposit (including interest earned thereon) "*to VLV rather than to DS*[*MC*]." (Emphasis added.) No provision in either the Funding Agreement or the escrow agreement authorized Mays, Jr./MBA to disburse VLV's funds at the sole direction of Stephens/DSMC, the second party to the transaction. And no provision in either agreement authorized Mays, Jr./MBA to disburse VLV's funds to the various entities to which he claimed to have disbursed them; certainly not to AMS Energy, LLC—an entity with which Mays, Jr. (and Stephens) was personally affiliated.

The evidence shows that Mays, Jr./MBA breached not only its duty to carry out the terms of the escrow agreement but also its duties to refrain both (1) from acting to the detriment of one principal over another principal and (2) from placing itself in a situation where its personal interests conflict with the duties owed to a principal. Accordingly, we cannot say that the circuit court clearly erred by finding Mays, Jr./MBA liable for negligence.

## B. Breach of Contract

A cause of action for breach of contract requires proof of "the existence of an agreement, breach of the agreement, and resulting damages." *Gunn*, 2024 Ark. App. 111, at 7, 684 S.W.3d at 344 (citation omitted). The same evidence supporting the circuit court's

negligence finding supports its finding regarding Mays, Jr./MBA's liability for breach of contract. The February 2015 escrow agreement required Mays, Jr./MBA to "hold and disburse" VLV's $290,000 deposit (including interest earned thereon) "in accordance with the terms of the Funding Agreement." Mays, Jr./MBA did not fulfill its obligations under the terms of either agreement. Because of Mays, Jr./MBA's failure in these regards, VLV suffered damages, including the total loss of its principal investment. Therefore, we hold that the circuit court did not clearly err by finding Mays, Jr./MBA liable for breach of contract.

## C. Breach of Fiduciary Duty

The duty of an escrow agent is a fiduciary duty; an escrow agent has "the duty of carrying out the terms and conditions of the escrow agreement." *Wochos*, 2010 Ark. App. 802, at 15, 378 S.W.3d at 289. An escrow agent "is required to exercise reasonable skill and ordinary diligence in carrying out his or her responsibilities and must conduct the affairs with which he or she is entrusted with scrupulous honesty, skill, and diligence." *Id*. A person standing in a fiduciary relationship may be held liable for any conduct that breaches a duty imposed by the fiduciary relationship. *Id*. Moreover, regardless of the express terms of an agreement, a fiduciary may be held liable for conduct that does not meet the requisite standards of fair dealing, good faith, honesty, and loyalty. *Id*. at 16, 378 S.W.3d at 289. For the same reasons stated above with respect to both negligence and breach of contract, we hold that the circuit court did not clearly err by finding Mays, Jr./MBA liable for breach of fiduciary duty.

23

## D. Conversion

The tort of conversion is committed when a party wrongfully commits a distinct act of dominion over the property of another that is inconsistent with the owner's rights. *Dent v. Wright*, 322 Ark. 256, 262, 909 S.W.2d 302, 305 (1995). Conversion does not require conscious wrongdoing; the mere intent to exercise control or dominion over another person's property is sufficient. *Car Transp. v. Garden Spot Distribs.*, 305 Ark. 82, 88, 805 S.W.2d 632, 635 (1991). Conversion entails interference with a party's right to possession, irrespective of disputed ownership claims. *Id.* If the defendant exercises control over the property in exclusion or defiance of the owner's rights, it is conversion, whether it is for defendant's own use or for another's use. *Reed v. Hamilton*, 315 Ark. 56, 59, 864 S.W.2d 845, 847 (1993). An act of conversion may occur even when the alleged converter derives no benefit from the transaction, *id.* at 60, 864 S.W.2d at 847, and even if the owner makes no demand for the return of the property. *Ford Motor Credit Co. v. Herring*, 267 Ark. 201, 204, 589 S.W.2d 584, 586 (1979). Retention of the property after a demand has been made, however, is evidence on the issue of punitive damages. *Williams v. O'Neal Ford, Inc.*, 282 Ark. 362, 364, 668 S.W.2d 545, 546 (1984).

The same evidence supporting Mays, Jr.'s liability for negligence, breach of contract, and breach of fiduciary duty also demonstrates that he wrongfully exercised control over VLV's $290,000. Mays, Jr. received and held the money in his IOLTA trust account before it disappeared. Whether Mays, Jr. simply followed Stephens's instructions to disburse the money is immaterial; mere intent to exercise control or dominion is sufficient to prove conversion. The same is true as to any claim that Mays, Jr. did not profit from holding and

disbursing VLV's money. And in this case, VLV did make a demand for the return of the money, and Mays, Jr. initially denied having any knowledge about the money and subsequently gave multiple inconsistent explanations regarding the money's whereabouts. The circuit court, therefore, did not clearly err by finding Mays, Jr. liable for conversion.

## E. Fraud and Misrepresentation

Mays, Jr. contends that because he did not make any representations of any kind to VLV prior to VLV's depositing its $290,000 investment into his IOLTA trust account, the circuit court erred by finding him liable for fraud and misrepresentation. We disagree.

To establish fraud, the following five elements must be proved: (1) a false representation of a material fact; (2) knowledge or belief that the representation is false or that there is insufficient evidence upon which to make the representation; (3) intent to induce action or inaction in reliance upon the representation; (4) justifiable reliance on the representation; and (5) damage suffered as a result of the reliance. *Wilson v. Gillentine*, 2021 Ark. App. 46, at 4, 618 S.W.3d 145, 147. A person may commit fraud even in the absence of an intent to deceive. *Id.* With constructive fraud, liability is based on representations that are made by one who, not knowing whether the representations are true or not, asserts them to be true. *Id.* at 4, 618 S.W.3d at 148. Thus, neither actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud. *Id.* Constructive fraud has been defined as a breach of a legal or equitable duty, which, irrespective of the moral guilt of the fraudfeasor, the law declares to be fraudulent because of its tendency to deceive others. *Wochos*, 2010 Ark. App. 802, at 13, 378 S.W.3d at 288. When there is a duty to communicate the concealed material fact, liability for nondisclosure may be found. *Id.* When

25

one party in a confidential relationship knows the other is relying on misinformation to his detriment, failure to speak is the equivalent of fraudulent concealment. *Id.*

Here, as stated above with respect to negligence, breach of contract, breach of fiduciary duty, and conversion, Mays, Jr. breached his escrow obligations by failing to disburse VLV's money pursuant to the terms of the Funding Agreement. Instead, he followed Stephens's unilateral instructions to disburse VLV's money to third parties, including an entity with which he had a personal affiliation, in clear breach of his fiduciary duty as an escrow agent to remain neutral and to refrain from acting to the detriment of VLV. VLV relied on representations in the agreements that its money would be transferred only as authorized, and VLV was financially damaged when this did not occur. Moreover, Mays, Jr. made multiple material misrepresentations regarding VLV's money after the fact. We hold that there was sufficient evidence that Mays, Jr. committed fraud. The circuit court, therefore, did not clearly err by finding him liable on this count.

F. Constructive Trust and Equitable Lien Based on Unjust Enrichment

Constructive trusts are imposed against a person who secures legal title by violating a confidential relationship or fiduciary duty or who intentionally makes a false oral promise to hold legal title for a specific purpose and, after having acquired the title, claims the property for himself. *Herring v. Ramsey*, 2021 Ark. App. 249, at 5, 626 S.W.3d 116, 120. The basis of a constructive trust is the unjust enrichment that would result if the person having the property was permitted to retain it. *Id.* To impose a constructive trust, there must be full, clear, and convincing evidence leaving no doubt with respect to the necessary facts. *Id.* at 6, 626 S.W.3d at 120. An equitable lien is a right to have a demand satisfied

from a particular fund or specific property. *C.A.R. Transp. Brokerage Co. v. Seay*, 369 Ark. 354, 361–62, 255 S.W.3d 445, 451 (2007). It is a remedy that awards a nonpossessory interest in property to a party who has been prevented by fraud, accident, or mistake from securing that to which he was equitably entitled.

Here, the evidence demonstrated that Mays, Jr. exercised control over VLV's money and then wrongfully disbursed it to third parties. Other than $40 that Mays, Jr. claimed was still in his IOLTA trust account, there was no evidence showing that Mays, Jr. received any of the rest of the $290,000 back and then kept it for himself. Indeed, no evidence was presented indicating where that money ultimately ended up. For these reasons, we cannot say that the remedies at law were inadequate and that equitable remedies of constructive trust and equitable lien were appropriate in this case. Accordingly, we reverse and dismiss the circuit court's findings on the claim for constructive trust and equitable lien based on unjust enrichment.

## VIII. *Punitive Damages*

Mays, Jr. challenges the circuit court's award of punitive damages, arguing that the circuit court erred by finding that he acted with the requisite mental state or purpose to justify an award of punitive damages. Punitive damages are awarded when justified by the facts of a case to punish a wrongdoer and deter others from similar future wrongdoing. *Jim Ray, Inc. v. Williams*, 99 Ark. App. 315, 321, 260 S.W.3d 307, 310 (2007). To recover punitive damages, the plaintiff has the burden of proving that the defendant is liable for compensatory damages and that either or both of the following aggravating factors were present and related to the injury for which compensatory damages were awarded:

27

(1) That the defendant knew or ought to have known, in light of the surrounding circumstances, that his or her conduct would naturally and probably result in injury or damage and that he or she continued the conduct with malice or in reckless disregard of the consequences, from which malice may be inferred; or

(2) The defendant intentionally pursued a course of conduct for the purpose of causing injury or damage.

Ark. Code Ann. § 16-55-206 (Supp. 2023). When receiving an award for punitive damages, the court considers the extent and enormity of the wrong, the intent of the party committing the wrong, all of the circumstances, and the financial and social condition and standing of the erring party. *Hudson v. Cook*, 82 Ark. App. 246, 261, 105 S.W.3d 821, 830 (2003). Punitive damages are a proper assessment for conduct that is malicious or done with deliberate intent to injure another. *Id.* Malice does not necessarily mean hatred; it is rather an intent or disposition to do a wrongful act greatly injurious to another. *Brown v. Blake*, 86 Ark. App. 107, 118, 161 S.W.3d 298, 306 (2004).

While punitive damages are not available when the sole cause of action is based in contract, they are available in cases based in tort and contract that involve fraud, misrepresentation, or deceit. *Trakru v. Mathews*, 2014 Ark. App. 154, at 12, 434 S.W.3d 10, 18. Punitive damages also are available when liability is based on conversion. *Brown*, 86 Ark. App. at 116–18, 161 S.W.3d at 305–06. In addition, breach of fiduciary duty accompanied by evidence of neglect of fiduciary responsibilities can support an award of punitive damages. *Horton v. Mitchell*, 2018 Ark. App. 610, at 10–11, 568 S.W.3d 274, 282–83. Punitive damages also are justified when "the negligent party knew, or had reason to believe, that his act of negligence was about to inflict injury, and that he continued in his course with a

28

conscious indifference to the consequences, from which malice may be inferred." *D'Arbonne Constr. Co., Inc. v. Foster*, 354 Ark. 304, 308–09, 123 S.W.3d 894, 898 (2003).

In this case, Mays, Jr. acted in clear violation of a fiduciary duty at the unilateral direction of Stephens and to the detriment of VLV. His course of conduct in these respects was taken to facilitate what the circuit court described as a "scam." And to conceal his breach of fiduciary duty, breach of contract, conversion, and fraud, he made multiple inconsistent statements and misrepresentations. By one of his own contradictory explanations, he engaged in self-dealing when he transferred $30,000 of VLV's money to AMS Energy, LLC, an entity that he created and for which he was held out publicly as general counsel and senior management. In short, at the very least, Mays, Jr. knew or ought to have known, in light of the circumstances, that his conduct would naturally and probably result in injury, *and* he continued in such conduct with malice or in reckless disregard of the consequences of his conduct, from which malice may be inferred. Accordingly, we cannot say that the circuit court clearly erred by finding that there was a sufficient basis upon which to award punitive damages.

IX. *Agency*

Appellant MBA argues that, without sufficient proof that Mays, Jr. was an agent of MBA, the circuit court had no basis for finding MBA liable for negligence, breach of contract, and breach of fiduciary duty. MBA further challenges the circuit court's finding that Mays, Jr.'s actions proximately caused VLV's loss. VLV contends that MBA's argument is at least partially unpreserved because MBA failed to raise it in its motion to dismiss at trial. We are not persuaded by VLV's preservation argument. In a civil bench trial, a party who

does not challenge the sufficiency of the evidence at trial does not waive the right to do so on appeal. *See, e.g.*, *AgriFund, LLC*, 2020 Ark. 246, at 7 n.4, 602 S.W.3d at 730 n.4 (rejecting preservation argument regarding sufficiency challenge in civil bench trial). We also find no merit in MBA's agency and causation arguments.

An agency relationship is created from the conduct of two parties in which one party, the principal, allows another, the agent, to act for him subject to the principal's control, and the agent consents to act in that manner. *Schuster's, Inc. v. Whitehead*, 291 Ark. 180, 181–82, 722 S.W.2d 862, 863 (1987). An agency relationship may be implied where one party, by his conduct, holds out another as his agent, or thereby invests him with apparent or ostensible authority as agent. *Id.* In doing so, the party becomes liable as the principal for the acts of the one held out or apparently authorized to act as agent, whether or not the party actually intended to be bound. *Id.* When the evidence shows that the person causing the injury was at the time rendering a service for the defendant and being paid for that service, and the facts presented are as consistent with the master-servant relationship as with the independent-contractor relationship, then the burden is on the party asserting the independence of the contractor to show the true relationship of the parties. *Id.* at 182–83, 722 S.W.2d at 863.

Here, among other evidence, there was evidence that MBA provided office space and an office telephone number for Mays, Jr., and Mays, Jr. was listed on MBA's letterhead as an associate attorney. MBA allowed Mays, Jr. to use an email address associated with the law firm's domain, maysbyrdlaw.com, which Mays, Jr. used in connection with the transactions at issue in this case. Mays, Jr. also included MBA in his signature block on

pleadings. In addition, MBA gave Mays, Jr. access to MBA's case-management database and billing software, and MBA was listed on the fee agreements for any work Mays, Jr. did on behalf of MBA. MBA provided malpractice insurance coverage for Mays, Jr. MBA also allowed Mays, Jr. to use an MBA IOLTA trust account, which MBA left in Mays, Jr.'s autonomy to manage and reconcile—the same as MBA did with its partner attorneys. Suffice it to say, there was plenty of evidence that MBA allowed Mays, Jr. to use the firm name and broadcast to the general public that he was an associate member of the firm.

To counter this evidence, MBA's corporate representative, Tiffany Mays O'Guinn, testified that Mays, Jr. worked for the law firm as an independent contractor and not as an employee. Through O'Guinn's testimony, MBA introduced a document titled "Attorney Services Agreement," which purportedly was signed by Mays, Jr. and Richard Mays, Sr., on October 13, 2010, and sets out the terms of Mays, Jr.'s independent-contractor relationship with MBA. O'Guinn, however, admitted on cross-examination that this document was disclosed for the first time the night before her February 24, 2019 deposition as a supplement to MBA's original discovery response. MBA's original discovery response had been filed eleven months earlier and stated that "no documents exist, as they are not required by Arkansas law." O'Guinn could not explain how or when the Attorney Services Agreement had been discovered in the eleven-month period after MBA's original discovery response. O'Guinn also testified that Mays, Jr. reimbursed the firm for the monthly premiums MBA paid for his malpractice insurance coverage, but she could not provide any documentation to that effect.

Viewed in the light most favorable to VLV, we cannot say that the evidence was insufficient to support a finding that Mays, Jr. was in an agency relationship with MBA. The circuit court, therefore, did not err by finding MBA liable for negligence, breach of contract, and breach of fiduciary duty. We also hold that the circuit court did not clearly err by finding that the actions of Mays, Jr. proximately caused VLV's loss. Proximate cause is that which, in a natural and continuous sequence unbroken by any efficient intervening cause, produces the injury, and without which, the result would not have occurred. *Chamber v. Stern*, 347 Ark. 395, 64 S.W.3d 737 (2002). As stated above with respect to his liability for negligence, breach of contract, breach of fiduciary duty, conversion, and fraud and misrepresentation, Mays, Jr. was obligated to disburse VLV's money pursuant to the terms of the Funding Agreement. His failure to do so directly resulted in the loss of VLV's money.

Affirmed in part; reversed and dismissed in part.

GRUBER and BARRETT, JJ., agree.

*Malone Law Firm*, by: *Jerry L. Malone*, for separate appellant Richard L. Mays, Jr.

*Gill Ragon Owen, P.A.*, by: *Christopher L. Travis*; and *Kenya G. Davenport*, for separate appellant Mays, Byrd & Associates, P.A.

*Charlie Cunningham* and *Dustin A. Duke*, for separate appellants Derrick Stephens, D. Stephens Management & Consulting, LLC, and Olena "Lola" Korneevets.

*James, House, Swann & Downing, P.A.*, by: *Matthew R. House* and *Kayla M. Applegate*, for appellee.